UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JOHN T. ARTZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. |
| | ) |
| ARMSTRONG FLOORING, INC., | ) |
| | ) |
| Serve at: | ) JURY TRIAL DEMANDED |
| | ) |
| CSC-Lawyers Incorporating Service Co. | ) |
| 221 Bolivar Street | ) |
| Jefferson City, MO 65101 | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW Plaintiff John Thomas Artz ("Plaintiff" or "Tommy"), by and through undersigned counsel, for his Complaint, states as follows:

## PARTIES & JURISDICTION

1. Plaintiff is an adult resident of West Plains, Missouri, citizen of the United States of America, and resident within the boundaries of the Southern Division of the Western District of Missouri.

2. Defendant Armstrong Flooring, Inc. ("Defendant" or "Armstrong") is a Delaware corporation doing business within the Western District of Missouri.

3. This Court has jurisdiction over Plaintiff's claims pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101; 1132; 1140 and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.

## FACTUAL BACKGROUND

5. Defendant is engaged in the manufacture and sale of residential and commercial flooring both domestically throughout the United States and internationally, with its principal place of business in Lancaster, Pennsylvania.

6. Defendant employs thousands of individuals worldwide and over two hundred individuals at its West Plains, Missouri plant.

7. Plaintiff was employed by Defendant as a Human Resources Manager at its West Plains, Missouri hardwood manufacturing plant from March 2014 until his wrongful discharge on September 1, 2017.

8. Plaintiff had no history of discipline or job performance issues during his employment with Defendant.

9. Plaintiff's work for Armstrong remained at a satisfactory or above satisfactory level at all relevant times.

10. About one (1) month after Plaintiff began working for Defendant, Plaintiff suffered cardiac-related events and was hospitalized for three days. At this time, Plaintiff was diagnosed with cardiomyopathy and atrial fibrillation, both "serious health conditions" as defined by the FMLA.

11. Plaintiff's serious health conditions required him to thereafter visit cardiac specialists in St. Louis, Missouri on a regular basis, approximately once every two months.

12. Aside from these regular visits (which only required two days off of work every two or three months), Plaintiff did not take any extended periods off from work in connection with

2

his serious health conditions, until December of 2016.

13. In December of 2016, Plaintiff was hospitalized for five days due to issues related to his serious health conditions. Plaintiff used two weeks of his vacation time to take time off from work to address said issues.

14. In January 2017, Plaintiff returned to work and was informed that Armstrong's plant manager of the West Plains, Missouri plant—James Cooper ("Cooper") had spoken with the plant controller—Scott Gregory ("Gregory")—regarding medical costs of the employees at the West Plains, Missouri plant and, in particular, the costs of Plaintiff's health care in the moments after a weekly meeting had concluded.

15. In February 2017, during a teleconference call, Armstrong's Vice President of Operations—Mike Bell ("Bell")—announced the company's intention to close some wood production plants due to poor quarterly reporting numbers if such numbers or circumstances did not change and urged all plants to cut spending and costs wherever possible to turn around the poor numbers.

16. In March 2017, Plaintiff took approved FMLA leave to have gastric sleeve surgery. Plaintiff's heart-condition-related medications negatively impacted his metabolism and caused him to gain excess weight, which Plaintiff was required to lose in the event his heart conditions worsened to the point he needed a heart transplant—a distinct possibility of which his physicians had previously and specifically warned. This surgery required a month off from work for purposes of surgery and recovery.

17. During his employer-approved FMLA leave, only a few days after Plaintiff's gastric sleeve surgery, Plaintiff's cardiac specialists recommended another surgery to implant a defibrillator and pacemaker due to his poor ejection fraction results. In April 2017, Plaintiff had

3

surgery to implant a defibrillator and pacemaker. In total, to address his serious health conditions, Plaintiff spent eleven days in the hospital and several more weeks recovering from his two surgeries.

18. Plaintiff's need for an additional surgery to implant a defibrillator and pacemaker extended the length of Plaintiff's FMLA leave. Plaintiff notified Armstrong of this need and extension through Cooper and then-Senior Human Resources Director—Hal McComas ("McComas").

19. Both Cooper and McComas told Plaintiff to get out of the hospital as quickly as he could and return to work.

20. In May 2017, Plaintiff returned to work and was again informed that Cooper, Gregory and/or other Armstrong officials had expressed surprise and/or disappointment about medical costs of employees at the West Plains, Missouri plant and specifically commented that "Tommy is costing a lot" in that regard.

21. At or around this time, Plaintiff had received a copy of his medical bills in connection with his recent treatment and care, which reflected a total cost of his medical care in excess of three hundred thousand dollars ($300,000.00).

22. Pursuant to the employer-provided health insurance plan for Armstrong employees at the West Plains, Missouri plant, Armstrong was responsible for 80% of Plaintiff's medical costs that exceeded his $3,000 deductible and 100% of Plaintiff's medical costs that exceeded $5,000 per individual.

23. In July 2017, Plaintiff notified Cooper and Armstrong's Senior Human Resources Director—Lisa Williams ("Williams")—who was based out of Lancaster, Pennsylvania, that he intended, pursuant to his wife's doctor's recommendation, to take FMLA leave on or around

4

Case 6:17-cv-03352-RK   Document 1   Filed 11/07/17   Page 4 of 14

September 18, 2017 to assist with his wife's day-to-day care following a surgery scheduled on that date to remove a tumor from her pituitary gland, a serious health condition as defined by the FMLA.

24. Plaintiff first spoke with Cooper about his FMLA leave request, who asked Plaintiff several questions about the details of his wife's scheduled surgery and hospital stay, including but not limited to questions about the maximum time he would be off from work, what type of doctor(s) his wife needed to see, and whether his wife could recover at home or in the hospital.

25. Approximately two days later, Plaintiff spoke with Williams regarding the same FMLA leave request, who—in an interrogation-like manner—asked Plaintiff the same or similar questions about the details of his wife's scheduled treatment. Plaintiff's FMLA request was eventually approved.

26. In August 2017, Plaintiff received a phone call from a medical review officer regarding the random drug screen results for an Armstrong employee ("L.G.").

27. L.G. was a long-tenured maintenance supervisor at the West Plains, Missouri plant who possessed a lot of plant- and machine-specific knowledge that was vital to the plant's continuous and successful operation.

28. L.G. had an extensive history of health issues for which he had various prescription medications prescribed to him.

29. After L.G. had not passed the random drug screen due to a positive result from his prescription medication, Cooper instructed Plaintiff to do everything he could to keep L.G. employed.

30. L.G. no longer possessed the medication bottle for the prescription medication at issue in his random drug screen and had difficulty locating his doctor (who was semi-retired and,

5

Case 6:17-cv-03352-RK   Document 1   Filed 11/07/17   Page 5 of 14

at that time, residing in another state or town) who had prescribed him the medication in question.

31. Plaintiff traveled to the local hospital to find out publicly available licensure information regarding L.G.'s doctor in an effort to find an updated location and/or contact information for L.G. to contact him.

32. A physician coordinator at the hospital provided updated location and/or contact information for L.G.'s doctor to Plaintiff, who provided the same to L.G.

33. After Plaintiff had located L.G.'s doctor and provided L.G. the same information, Plaintiff informed Cooper of the steps he had taken and what he had done to help L.G. Cooper thanked Plaintiff and expressed appreciation for his efforts.

34. Plaintiff thereafter told Williams the same information, who first asked Plaintiff why he had gone to the local hospital to find out information for L.G. Plaintiff explained that both Cooper and L.G. asked him for his help, and that Plaintiff would have taken the same actions for any other employee. Williams responded, "Wow. Okay" but did not thereafter state to Plaintiff what (if anything) he had done wrong under the circumstances. Their conversation ended by Williams asking Plaintiff to keep her updated on the situation.

35. Ultimately, L.G.'s doctor could not find the original prescription he had issued to L.G. so L.G. was unable to provide the same to the medical review officer.

36. Approximately three days later, on or around August 21, 2017, Plaintiff again spoke with Williams, who instructed Plaintiff to terminate L.G. because L.G. was unable to locate and provide a prescription for the medication for which he tested positive during his random drug screen.

37. On or around August 22, 2017, Plaintiff informed L.G. of the decision to terminate L.G.'s employment.

38. On or around August 25, 2017, Williams and Plaintiff had their regular weekly update telephone call during which they discussed various issues regarding the plant, including leadership matters, hiring, disciplinary events, and other work-related matters. Toward the end of this call, Williams stated there was a "major issue" with Plaintiff and that Williams would be recommending that Plaintiff "find another job."

39. Williams further stated Plaintiff did not handle the drug screen process of L.G. well and noted that a recent audit by corporate had looked at some corporate credit card activity involving Plaintiff.

40. Plaintiff explained to Williams that the three credit card charges by him at issue in that recent audit were fully reviewed and cleared by corporate. Williams did not state what specifically (if anything) Plaintiff had done wrong in connection with L.G.'s random drug screen.

41. Williams largely—if not wholly—disregarded Plaintiff's explanations of these two purported issues and indicated they would talk next week.

42. Plaintiff thereafter spoke with Cooper about Williams' comment that he should "find another job," to which Cooper remarked that there were a lot of changes coming regarding the employees at the West Plains, Missouri plant which he could not discuss with Plaintiff.

43. On August 28, 2017, Cooper called Plaintiff into his office to participate in a phone call with Williams. At this time, Williams informed Plaintiff he would be suspended pending investigation of how he handled L.G.'s drug screen and Plaintiff's involvement in the recent corporate audit.

44. Plaintiff defended himself against these claims. In particular, Plaintiff explained that the audit did not find him at fault at all (unlike other employees, one of which had been responsible for dozens of violations) and that he did what he did for L.G. due to Cooper's

7

Case 6:17-cv-03352-RK   Document 1   Filed 11/07/17   Page 7 of 14

instruction to do everything he can to help L.G. stay employed. Williams thereafter asked Cooper directly whether he had asked Plaintiff to do everything he could to help L.G. Cooper admitted to Williams that he had.

45. On or around September 1, 2017, while suspended, Plaintiff received a telephone call from Williams who informed Plaintiff of Defendant's decision to terminate his employment effective immediately, purportedly due to the two abovementioned issues.

46. Plaintiff asked Williams to provide the reasons for his termination to him in writing. Williams responded, "we'll see if we can provide that" but never provided any writing explaining the basis for Plaintiff's termination.

47. The reasons Defendant provided for Plaintiff's termination are false and/or pre-textual in that the corporate audit confirmed Plaintiff did nothing wrong (unlike other employees) and Plaintiff did nothing wrong with respect to the handling of L.G.'s random drug screen.

48. The motivating factors for Plaintiff's termination were his and his wife's medical conditions, the increased medical costs associated with treatment of his and his wife's medical conditions, and his requests for FMLA leave in connection therewith.

49. Within a month or two following Plaintiff's termination, Defendant terminated at least two other managers at the West Plains, Missouri plant who had histories of health issues and/or requests for leave in connection therewith (including family members with health issues who were on their health insurance plans through Defendant).

50. One of these managers—a long-tenured employee of Defendant with a wealth of industry knowledge and experience—had diabetes and had recently taken leave from work in August of 2017 in order to take care of his wife who had surgery at that time. The other manager also had diabetes.

51. As a direct result of Defendant's unlawful retaliation and discrimination, Plaintiff—the sole provider for his family—has lost all of his income, and has missed payments on his utilities, mortgage, credit card, and medical bills, causing immediate and substantial financial stress on Plaintiff and his family.

52. As a direct result of Defendant's unlawful retaliation and discrimination, Plaintiff has suffered emotional distress and reputational harm in his community.

53. Through the abovementioned statements, actions and/or omissions, Defendant—through its authorized agents and representatives—sought to discourage and interfere with Plaintiff (and other Armstrong employees) exercising and attaining his (and their) rights as a participant and beneficiary in an employee benefit plan governed by ERISA.

54. Through the abovementioned statements, actions and/or omissions, Defendant—through its authorized agents and representatives—unlawfully discriminated and retaliated against, and discharged, Plaintiff for requesting and/or taking FMLA-protected leave.

## COUNT I
## UNLAWFUL DISCRIMINATION AND DISCHARGE IN VIOLATION OF ERISA

55. Plaintiff re-pleads and incorporates herein by reference each and every one of the allegations set forth above.

56. Defendant, as administrator of Plaintiff's health insurance plan, had discretionary authority to administer it. As such, the health insurance plan under which Plaintiff received coverage was established under, and governed by, ERISA, 29 U.S.C. § 1001 *et seq.*

57. Plaintiff had participated, and was expected to further participate, in a statutorily protected activity (*i.e.*, the use of health insurance benefits and coverage).

58. Plaintiff is an aggrieved participant and beneficiary under an ERISA plan.

59. Defendant ultimately terminated Plaintiff's employment due to his exercise of

rights under an employee benefit plan.

60. A causal connection exists between Plaintiff's use of health insurance benefits and Defendant's discharge of Plaintiff.

61. Defendant discharged Plaintiff (and other similarly situated employees) with the specific intent to avoid and/or reduce medical costs incurred by employees on Defendant's group health insurance plan.

62. Any justification proffered by Defendant for the adverse actions taken against Plaintiff (*i.e.*, his discharge) is false and/or pre-textual.

63. As a direct and proximate result of Defendant's actions, statements, omissions, and/or other conduct, Plaintiff has suffered damages, including but not limited to: loss of employment, health care benefits, and wages.

WHEREFORE, Plaintiff John Thomas Artz respectfully requests the Court to enter judgment in his favor and against Defendant on Count I of this Complaint, as follows: declare Defendant's actions were in violation of ERISA; order reinstatement of Plaintiff to his position as Human Resources Manager at Armstrong's West Plains, Missouri plant; in connection with reinstatement, award Plaintiff John Thomas Artz restitution in the form of back pay for Defendant's violations of ERISA in an amount equal to his lost wages and other benefits of employment (including but not limited to the employer portion of his medical costs), with pre- and post-judgment interest; and award reasonable attorneys' fees and costs incurred herein; and such other and further relief as the Court deems just and proper.

## COUNT II
## INTERFERENCE WITH RIGHTS PROTECTED BY THE FMLA

64. Plaintiff re-pleads and incorporates herein by reference each and every one of the allegations set forth above.

65. At all times relevant hereto, Plaintiff was an eligible employee within the definition of the FMLA because Plaintiff had been employed for at least twelve months by Armstrong, had logged at least 1,250 hours of service with Armstrong during the twelve-month period preceding the dates of his taking and/or requesting leave from work, and was employed at a work site where Armstrong employed fifty or more employees within seventy five miles of that worksite.

66. At all times relevant hereto, Defendant was an employer within the definition of the FMLA because Defendant was engaged in an industry or activity affecting commerce and employed fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year.

67. Plaintiff requested and took medical leave under the FMLA in connection with his serious health conditions in March, April and May of 2017.

68. Plaintiff requested medical leave under the FMLA (to be taken on or around September 18, 2017) in connection with his wife's serious health condition in July of 2017.

69. Defendant terminated Plaintiff on or around September 1, 2017 prior to Plaintiff taking the FMLA medical leave that Defendant approved, and thus interfered with and violated Plaintiff's FMLA rights, as well as deterred other employees from exercising their FMLA rights.

70. Defendant's termination of Plaintiff denied Plaintiff the medical leave benefits to which he was entitled under the FMLA.

71. Defendant's termination has caused Plaintiff to lose wages and other benefits of his employment with Armstrong, including loss of employee benefits and healthcare insurance.

72. Plaintiff's damages are a direct and proximate result of Defendant's interference with the rights afford to him by the FMLA.

73. Defendant did not have a legitimate business reason for terminating Plaintiff.

74. Defendant's conduct was not in good faith, entitling Plaintiff to an award of liquidated damages.

75. Defendant's conduct was outrageous and extreme, and was intentional or in reckless disregard of Plaintiff's rights.

WHEREFORE Plaintiff John Thomas Artz respectfully requests this Court, after trial by jury, enter judgment for Plaintiff and against Defendant on Count II of this Complaint, and prays for an award of actual damages in an amount to be proved at trial, including but not limited to back pay, front pay, compensatory damages, together with interest thereon, liquidated damages, reasonable attorneys' fees, expert fees and costs, and any other further relief available at law or equity that this Court deems just and proper under the circumstances.

## COUNT III
## RETALIATION AND DISCHARGE FOR EXERCISING RIGHTS PROTECTED BY THE FMLA

76. Plaintiff re-pleads and incorporates herein by reference each and every one of the allegations set forth above.

77. Plaintiff engaged in conduct protected by the FMLA by requesting and taking medical leave for his serious health conditions.

78. Plaintiff engaged in conduct protected by the FMLA by requesting medical leave for his wife's serious health condition.

79. Defendant terminated Plaintiff's employment in retaliation for taking time off from work for medical leave and for lawfully requesting medical leave under the FMLA.

80. Plaintiff's termination was an adverse employment action caused by the exercise of his rights under the FMLA.

WHEREFORE Plaintiff John Thomas Artz respectfully requests this Court, after trial by jury, enter judgment for Plaintiff and against Defendant on Count III of this Complaint, and prays for an award of actual damages in an amount to be proved at trial, including but not limited to back pay, front pay, compensatory damages, together with interest thereon, liquidated damages, reasonable attorneys' fees, expert fees and costs, and any other further relief available at law or equity that this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues in this case which are so triable.[1]

---

[1] It is well-established that Plaintiff has a right to a jury trial on his FMLA claims. *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 642-44 (6th Cir. 1998); *see also Wages v. Stuart Management Corp.*, 798 F.3d 675, 681 (8th Cir. 2015). While Plaintiff acknowledges that many claims under ERISA do not implicate a right to a jury trial, to the extent ERISA claims can implicate a right to a jury trial, Plaintiff seeks to preserve such right by making the request here. *See, e.g.*, *Hellmann v. Cataldo*, No. 12-cv-02177-AGF, 2013 U.S. Dist. LEXIS 117676 (E.D. Mo. Aug. 20, 2013) (denying motion to strike jury demand in complaint based on violations of ERISA).

Respectfully submitted,

By: */s/ Kevin J. Dolley*
Kevin J. Dolley (#54132MO)
LAW OFFICES OF KEVIN J. DOLLEY, LLC
2726 S. Brentwood Blvd.
St. Louis, MO 63144
(314) 645-4100 (office)
(314) 736-6216 (fax)
kevin@dolleylaw.com

*Attorneys for Plaintiff John Thomas Artz*