UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN T. ARTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No.:  6:17-CV-03352-RK |
| vs. | ) | |
| | ) | |
| ARMSTRONG FLOORING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant Armstrong

Flooring, Inc. ("AFI") hereby submits the following Suggestions in Support of its Motion for

Summary Judgment.

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF UNCONTROVERTED FACTS ......................................................... 2

      A.    Parties................................................................................................................ 2

      B.    Artz's Position at AFI ....................................................................................... 2

      C.    AFI's Relevant EEO Policy, HR Matrix, and Code of Business Conduct ............ 3

      D.    Performance Issues Identified in Artz's Performance Reviews ............................ 5

      E.    Artz's Mishandling of an Employee's Drug Test and Resulting Verbal
            Warning.............................................................................................................. 6

      F.    Artz's Dishonesty During Audit Investigation and Resulting Suspension.......... 10

      G.    Artz's Termination by Lisa Williams for Lack of Trust and his Dishonesty ...... 13

      H.    Artz's Violation of the COBC and HIPAA ....................................................... 14

      I.    Artz Requested and Received FMLA Leave in 2017, as Did Other HR
            Managers.......................................................................................................... 17

      J.    Lisa Williams, James Cooper, and Scott Gregory Had No Knowledge of
            Artz's Alleged Benefits Use or Medical Costs .................................................. 19

      K.    Artz has No Evidence of AFI's Supposed Knowledge of His Actual
            Medical Costs................................................................................................... 20

      L.    Artz's Alleged Comparators Demonstrates the Lack of Information
            Available Regarding AFI Employee's Actual Medical Costs ............................. 21

      M.    AFI Had No Knowledge of Artz's Alleged Disability ....................................... 22

III.  ARGUMENT ......................................................................................................... 23

      A.    Plaintiff's Claims ............................................................................................ 23

      B.    Applicable Summary Judgment Motion Standards ............................................ 24

1.     Summary Judgment Standards ................................................................. 24

2.     AFI Had Legitimate, Nondiscriminatory Business Reasons for
Artz's Termination ..................................................................................... 25

       a.     Historical Performance Issues Regarding Artz's Lack of
Support for the Plant Management Was a Basis of Concern ....... 27

       b.     Artz's Mishandling of a Positive Drug Test and Resulting
Verbal Warning ........................................................................... 27

       c.     Artz's Dishonesty During Audit Investigation and
Resulting Suspension ................................................................... 29

3.     The After-Acquired Evidence Doctrine Applies as Artz's Improper
Disclosure of Confidential, Medical Information Would Have
Resulted in His Termination ....................................................................... 32

4.     Artz Failed to Establish a Prima Facie ERISA Claim Because He
Failed to Establish a Specific Intent by Ms. Williams to Interfere
With His Benefits ........................................................................................ 36

       a.     Artz Failed to Establish Any Direct Evidence Ms. Williams
was Motivated by His Benefits Use or Had Any
Knowledge of the Cost to AFI of Any Alleged Benefits Use ...... 36

       b.     To Establish Knowledge of His Medical Costs, Artz Relies
on an Alleged Conversation Between Two Managers of
Which He Has No Personal Knowledge and Does Not
Establish Knowledge By Ms. Williams ....................................... 38

       c.     In an Attempt to Establish Causation Between Alleged
Knowledge of Medical Costs and Subsequent Termination,
Artz Pointed to Two Comparators Who Only Demonstrate
the Lack of Medical Cost Information Available and Lack
of Causation ................................................................................. 41

       d.     Artz Failed to Establish Ms. Williams Terminated Him to
Avoid His Benefits Payments ...................................................... 42

5.     Artz Was Not Terminated for Taking or Requesting FMLA Leave ........ 43

6. Artz Cannot Establish an Alleged Disability or Show it Was
Reason for His Termination ...................................................................... 47

IV. CONCLUSION ........................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. CSL Plasma*,
Case No. 4:16-cv-131, 2016 U.S. Dist. LEXIS 89305 (E.D. Mo. July 11, 2016) .................................................................................................................50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................24, 25

*Baldridge v. Kan. City Pub. Sch.*,
552 S.W.3d 699 (Mo. App. 2018) ...........................................................................48

*Boone v. Palomar Health*,
No. 13CV1745 JLS (KSC), 2015 WL 11988943 (S.D. Cal. Nov. 3, 2015) ...........................49

*Briggs v. Delta Air Lines, Inc.*,
353 F. Supp. 3d 641 (E.D. Mich. 2019).................................................................49

*Brooks v. Tri-Sys., Inc.*,
425 F.3d 1109 (8th Cir. 2005) .........................................................................39

*Brown v. BKW Drywall Supply, Inc.*,
305 F. Supp. 2d 814 (S.D. Ohio 2004) ...................................................................50

*Brunko v. Mercy Hosp.*,
260 F.3d 939 (8th Cir. 2001) ..........................................................................50

*Carter v. CSL Plasma Inc.*,
No. 13-CV-00814-FJG, 2014 WL 12825056 (W.D. Mo. Feb. 27, 2014) ...............................33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................24

*Davidson & Assocs. v. Jung*,
422 F.3d 630 (8th Cir. 2005) ..........................................................................24

*Den Hartog v. Wasatch Academy*,
129 F.3d 1076 (10th Cir.1997) .........................................................................52

*Gaskins v. Rock-Tenn Corp.*,
982 F.Supp.2d 760 (S.D. Ohio 2013) ....................................................................38

*Grissom v. Arnott*,
No. 09-03244-CV-S-SWH, 2012 WL 1309266 (W.D. Mo. Apr. 16, 2012) ..............................40

*Harris v. Dinesh Chand*,
    506 F.3d 1135 (8th Cir. 2007) ..............................................................................32

*Haynes v. BIS Frucon Eng'g, Inc.*,
    No. 4:08-CV-701 CAS, 2009 WL 995460 (E.D. Mo. Apr. 14, 2009)....................................36

*Hedberg v. Indiana Bell Tel. Co.*,
    47 F.3d 928 (7th Cir. 1995) ..............................................................................51

*Heintzelman v. Runyon*,
    120 F.3d 143 (8th Cir. 1997) ..........................................................................49, 53

*Hill v. Wheatland Waters, Inc.*,
    327 F. Supp. 2d 1294 (D. Kan. 2004)....................................................................35

*Johnson v. City of Kansas City, Missouri*,
    No. 4:18-00015-CV-RK, 2019 WL 252539 (W.D. Mo. Jan. 17, 2019) ..............................48

*Kinkead v. Sw. Bell Tel. Co.*,
    49 F.3d 454 ..............................................................................................36

*Kipp v. Missouri Highway and Transp. Com'n*,
    280 F.3d 893 (8th Cir. 2002) ..........................................................................46

*Koons v. Aventis Pharm., Inc.*,
    367 F.3d 768 (8th Cir. 2004) ......................................................................25, 36

*Krone v. City of Pine Lawn*,
    No. 4:16CV1801 RLW, 2017 WL 1424320 (E.D. Mo. Apr. 20, 2017) ..............................48

*Lidge-Myrtil v. Deere & Co.*,
    49 F.3d 1308 (8th Cir. 1995) ......................................................................26, 31

*Malloy v. U.S. Postal Service*,
    756 F.3d 1088 (8th Cir. 2014) ..........................................................................45

*Manuele v. City of Jennings*,
    No. 4:10CV1655 JAR, 2012 WL 113538, at *11-13 (E.D. Mo. Jan. 13, 2012)...............39, 40

*Mathews v. Trilogy Communications, Inc.*,
    143 F.3d 1160 (8th Cir. 1998) ..........................................................................25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 474 (1986)......................................................................................24

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..................................................................................25, 37

*McKennon v. Nashville Banner Publ'g Co.*,
    513 U.S. 352 (1995)..............................................................................................32, 33

*Memhardt v. Nationstar Mortg., LLC*,
    No. 4:17-CV-01411-AGF, 2018 WL 5923445 (E.D. Mo. Nov. 13, 2018) ............................40

*Miller v. Mercy Med. Ctr.-N. Iowa*,
    No. C05-2053 EJM, 2006 WL 3743830 (N.D. Iowa Dec. 18, 2006) ....................................35

*Nichols v. ABB DE, Inc.*,
    324 F. Supp. 2d 1036 (E.D. Mo. 2004)...................................................................................52

*Nilles v. Givaudan Flavors Corp.*,
    521 F. App'x 364 (6th Cir. 2013) .....................................................................................50, 51

*Pendleton v. QuikTrip Corp.*,
    567 F.3d 988 (8th Cir. 2009) ...........................................................................................37, 42

*Phillips v. Mathews*,
    547 F.3d 905 (8th Cir. 2008) ...............................................................25, 26, 31, 43, 44, 45

*Poitras v. Glaxo SmithKline Consumer Healthcare, LP*,
    635 F. Supp. 2d 1003 (E.D. Mo. 2009)..................................................................................26

*Ponder v. Verizon North, Inc.*,
    No. 4:09–CV–1763 CA, 2010 WL 4868080 (E.D. Mo. Nov. 23, 2010)...........................44, 48

*Regel v. K Mart Corp.*,
    190 F.3d 876 (8th Cir. 1999) .................................................................................................37

*Register v. Honeywell Fed. Aff'g. & Techs., LLC*,
    397 F.3d 1130 (8th Cir. 2005) ...............................................................................................36

*Richter v. Advance Auto Parts, Inc.*,
    686 F.3d 847 (8th Cir. 2012) .................................................................................................52

*Rollins v. Mo. Dep't of Cons.*,
    315 F. Supp. 2d 1011 (W.D. Mo. 2004) ................................................................................26

*Scruggs v. Pulaski Cty., Ark.*,
    817 F.3d 1087 (8th Cir. 2016) ...............................................................................................51

*Sisk v. Picture People, Inc.*,
    669 F.3d 896 (8th Cir. 2012) ...........................................................................................46, 47

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 502 (1993)................................................................................................................25

*Stalling v. Hussmann Corp.*,
447 F.3d 1041 (8th Cir. 2006) ..........................................................................43

*Swyers v. Thermal Sci., Inc.*,
887 S.W.2d 655 (Mo. Ct. App. 1994)..................................................................33

*Thomas v. Corwin*,
483 F.3d 516 (8th Cir. 2007) ..............................................................................25

*Throneberry v. McGehee Desha County Hospital*,
403 F.3d 972 (8th Cir. 2005) ........................................................................44, 45

*Torlowei v. Target*,
401 F.3d 933 (8th Cir. 2005) ..............................................................................26

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*,
534 U.S. 184 (2002).............................................................................................48

*Walz v. Ameriprise Fin., Inc.*,
779 F.3d 842 (8th Cir. 2015) ..............................................................................47

*Weber v. Strippit, Inc.*,
186 F.3d 907 (8th Cir. 1999) ....................................................................48, 49, 53

*White v. Carmeuse Lime & Stone, Inc.*,
No. 2:09-CV-265, 2011 WL 3585064 (W.D. Mich. May 31, 2011) .....................41

*Wilking v. Cnty. of Ramsey*,
153 F.3d 869 (8th Cir. 1998) ........................................................................26, 51

*Williams v. Asbury Auto. Grp., Inc.*,
998 F. Supp. 2d 769 (E.D. Ark. 2014) .................................................................35

**Statutes**

29 U.S.C. §§ 101, 1132, 1140............................................................................23, 47

29 U.S.C. § 1140.......................................................................................................36

29 U.S.C. § 2601 *et seq.*..........................................................................................24

42 U.S.C. § 2000e–2(m)............................................................................................48

42 U.S.C. § 2000e-5(e)(1).........................................................................................52

42 U.S.C. § 12101, *et seq.*.......................................................................................24

MO. REV. STAT. § 213.010, *et seq.*....................................................................24, 48

P.L. No. 104-191, 110 Stat. 1938 (1996)..........................................................................................14

P.L. No. 99–272, 100 Stat. 82 (1985) ............................................................................................18

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................................24

Fed. R. Civ. P. 56(e) ....................................................................................................................24

## I. PRELIMINARY STATEMENT

Plaintiff John T. Artz ("Artz") was terminated from his position as a Human Resources Manager with AFI due to a lack of trustworthiness and his poor decision making. Artz's supervisor, Lisa Williams, terminated him, because of his dishonesty during a purchase card audit investigation, his poor judgment in handling an employee's positive drug test including a failure to notify Ms. Williams and the plant manager in a timely manner and going to a local hospital to try to track down the employee's doctor, and performance deficiencies identified by Ms. Williams in his performance reviews concerning a lack of trust, respect, and rapport with his plant management, whom Artz supported. AFI's legitimate non-discriminatory reasons for Artz's termination auger in favor of summary judgment.

Artz's claims for discrimination and retaliation in violation of ERISA, the ADA, the FMLA, and the MHRA revolve around the unsubstantiated contention that his alleged high medical costs were the supposed improper reason for his termination. Artz's claims are factually unsupported and baseless as a matter of law. Artz cannot establish a causal connection between any alleged protected rights or actions and AFI's decision to terminate his employment. Fatally, Artz has no independent knowledge or direct evidence to support his theory Ms. Williams knew of his actual medical costs, much less that it motivated her termination decision. In fact, Ms. Williams had no knowledge of Artz's actual medical costs and did not even have access to it. Simply put, Artz's claims suffer from a fundamental deficiency - his medical costs could not have been the motivating factor in his termination, if Ms. Williams had no knowledge of them.

Separately, Artz's recovery is barred, in whole, or in part, by the doctrine of after-acquired evidence. At deposition, Artz admitted he violated company policy and federal law in the course of his employment when he forwarded confidential HIPAA-protected medical information of other

AFI employees to his personal e-mail account for no legitimate business reason. Artz would have been terminated, had he still been employed by AFI when it discovered his admitted misconduct. Based on these undisputed facts and the applicable law, AFI is entitled to summary judgment on all of Artz's Counts and its affirmative defense of after-acquired evidence.

## II.    STATEMENT OF UNCONTROVERTED FACTS

### A.    Parties.

1.      Artz is a former Human Resources ("HR") Manager for AFI at its plant in West Plains, Missouri ("West Plains plant"). Artz's Deposition ("Artz Dep.") attached as Exhibit A, at 10:13-16. Artz was employed by AFI from March 2014 until his termination on September 1, 2017. Artz's First Amended Complaint (the "Complaint"), ¶ 9.

2.      AFI is a global manufacturer and supplier of residential and commercial flooring. Complaint, ¶ 5.

### B.    Artz's Position at AFI.

3.      From June 2017 to September 2017, Artz directly reported to HR Manager Lisa Williams. Ex. A, Artz Dep. 11:17-12:5; 237:206. Ms. Williams worked out of AFI's corporate headquarters in Lancaster, Pennsylvania. Ex. A, Artz Dep. 303:9-20; *see also*, Complaint ¶¶ 7; 27. Ms. Williams was never physically present in the West Plains plant, prior to Artz's termination. Ex. A, Artz Dep. 303:21-24. Ms. Williams conducted Artz's performance evaluations. Ex. A, Artz Dep. 12:7-20. Ms. Williams was responsible for decision-making for discipline and terminations of HR employees at the West Plains plant, including Artz. Lisa Williams' Deposition ("L. Williams Dep."), attached hereto as Exhibit B, at 47:22-25; 51:4-7; Ex. A, Artz Dep. 12:11-21.

4.      From April 2017 to September 2017, Artz worked with West Plains Plant Manager

James Cooper.  Ex. A, Artz Dep. 11:14-16; 101:15-17.  Artz did not directly report to Mr. Cooper, but had a "dotted line" relationship.  Ex. A, Artz Dep. 11:8-13; 12:10-20.  Mr. Cooper was not responsible for decision-making for discipline or terminations of HR employees at the West Plains plant.  Ex. A, Artz Dep. 12:21-13:7; 13:11-21; James Cooper's Deposition, ("Cooper Dep."), attached hereto as Exhibit C, at 119:1-3; 263:21-23.

5.      Artz was responsible for managing the HR functions of the West Plains plant, including:  hiring, firing, performance evaluations, counseling, discipline, payroll, employee relations, policy development and enforcement, development and training on AFI policies and procedures, partnering with the Plant Manager, plant management, plant safety, and corporate compliance, and other duties as assigned.  Ex. A, Artz Dep. 22:8-23:23.

6.      Artz had one direct report, Kimberly Wake, HR Coordinator.  Ex. A, Artz Dep. 10:17-22.

7.      Human resource managers are not responsible for cost goals, but rather are focused on people.  Ex. B, L. Williams Dep. 20:7-13.

**C.      AFI's Relevant EEO Policy, HR Matrix, and Code of Business Conduct.**

8.      The AFI Equal Opportunity and Anti-Harassment Policies prohibit discrimination or harassment on the basis of disability, or any other basis prohibited by law.  AFI0000608-AFI0000709, AFI West Plains, MO Plant Hourly Production Employee Handbook, November 2014. ("Employee Handbook"), attached as Exhibit D.[1]

9.      Artz was responsible for updating the handbook with policy changes or revisions to the employee handbook pertaining to the West Plains plant.  Ex. A, Artz Dep. 32:21-33:2.

10.      AFI employees who suffer or observe harassment are encouraged to notify their

---

[1] All AFI bates-labeled documents have been authenticated by Affidavit of Business Records Custodian.

supervisor, the Equal Employment Opportunity or HR Manager at their location, the EEO Coordinator for that location, or, if they need to speak with someone not assigned to that facility, they may contact AFI Legal Counsel, AFI Office of Compliance, or the AFI 24/7 Ethics Line. Ex. D, Employee Handbook.

11.    Artz understood AFI employees could submit complaints directly to Ms. Wake, or Mr. Cooper at the West Plains plant, or, if they felt they didn't want to address issues at the plant, they could call the 24/7 corporate compliance hotline or could speak to any other member of management, as managers had an open door policy. Ex. A, Artz Dep. 34:8-38:10.

12.    AFI has a zero tolerance policy for harassment and retaliation and will promptly and thoroughly investigate any alleged misconduct, and immediately take any appropriate corrective action. Ex. D, Employee Handbook.

13.    Artz was responsible for receiving complaints at the West Plains plant. As a guide for determining the course of action, HR Managers relied upon the HR Process Control Matrix ("HR Matrix"). Ex. A, Artz Dep. 36:9-25; AFI0000258, HR Matrix – Edited May 2017, attached as Exhibit E.

14.    The HR Matrix outlines when a HR manager needs to escalate communications on specified issues. Ex. E, HR Matrix – Edited May 2017.

15.    In 2017, any time potential discipline or termination was considered for a salaried employee, the HR Business Partner, the Senior HR Manager, and Legal & Employment Practices were to be notified. Ex. E, HR Matrix – Edited May 2017.

16.    The AFI Code of Business Conduct ("COBC") sets out its expectations for how business is to be conducted. Artz Dep. 66:21-67:1; *see also*, AFI0000286-AFI0000333, COBC, attached as Exhibit F. AFI employees must "maintain high moral and ethical standards and to

4

reflect honesty, integrity, reliability, forthrightness in all relationship." Ex. A, Artz Dep. 67:10-16; Ex. F, COBC. AFI employees are to "act with integrity, follow the law and company policies, and communicate with candor" and "raise issues and concerns and cooperate with all investigations." Ex. A, Artz Dep. 67:25-68:14.

17. Artz understood it was an obligation for him to operate with honesty and integrity. Ex. A, Artz Dep. 67:17-24.

18. The COBC addresses proper handling of business records, including medical forms and emails, requiring AFI employees to "[m]aintain all company records and reports in accordance with the law." The COBC provides employee information is "confidential" and AFI employees are to "[p]rotect the personal information of others and handle it in accordance with our privacy policies and applicable privacy laws." AFI employees are only to "[c]ollect, use and process personal data only for legitimate business purposes" and are to "[p]rotect the privacy and security of information entrusted to us." Ex. F, COBC.

19. Artz was responsible for orientation and training of West Plains' plant employees on AFI anti-discrimination, anti-retaliation, drug testing, FMLA, and leave of absence policies as well as the COBC. Ex. A, Artz Dep. 26:11-27:20; 27:22-31:1; 65:25-66:2.

**D. Performance Issues Identified in Artz's Performance Reviews.**

20. Annually, Artz received two performance reviews. Ex. A, Artz Dep. 72:6-14.

21. In 2015, Artz was advised he needed improved performance in: engaging with the plant management, providing support to managers, being more visible, and knowing AFI policies. Ex. A, Artz Dep. 72:20-24; 80:11-23; 86:9-15; *see also*, AFI0000357-AFI0000366, 2015 Year-End Performance Review for Artz, attached as Exhibit G.

22. In 2017, Artz was notified of concerns regarding the need to develop trust with the

plant management. Ex. A, Artz Dep. 76:11-15; 102:3-10; *see also*, AFI0008281-AFI0008293, Artz 2017 Mid-Year Performance Review, attached as Exhibit H. Specifically, Ms. Williams advised Artz his support and coaching with Mr. Cooper and his plant management is very important and Artz needed more relationship building to better align with the plant management. Ms. Williams specifically advised Artz he needed continued growth in the areas of inviting feedback and demonstrating trustworthiness. Ex. H, Artz 2017 Mid-Year Performance Review. Ms. Williams had received feedback from peers and Artz's former supervisor as to issues of trustworthiness. Ex. B, L. Williams Dep. 240:12-23. Artz was also advised to utilize Ms. Williams and the HR Matrix to inform his appropriate corporate partners of issues that arise. Ex. H, Artz 2017 Mid-Year Performance Review.

> **E.    Artz's Mishandling of an Employee's Drug Test and Resulting Verbal Warning.**

23.    AFI employees may be subject to random drug testing, pursuant to the AFI Drug and Alcohol Policy. Ex. D, Employee Handbook. AFI employees who test positive for illegal drugs are subject to disciplinary actions, up to and including discharge. Ex. D, Employee Handbook.

24.    AFI conducts random drug tests for the safety of AFI and its employees. Ex. A, Artz Dep. 114:4-9.

25.    Artz was responsible as the West Plains plant HR Manager for responding to positive drug tests at the plant. Ex. A, Artz. Dep. 114:4-117:2

26.    Artz had substantial experience in addressing drug testing procedures. Ex. A, Artz Dep. 115:1-10.

27.    Artz understood because of the significant safety issues posed, it was important he immediately respond to any positive drug test. Ex. A, Artz Dep. 116:21-117:2. In particular,

safety issues were paramount for employees that work around or operate machinery.  Ex. A, Artz Dep. 136:13-25.

28.     Artz understood the West Plains plant practice to be if an employee has no prescription or reason for the positive result, they are suspended and corporate was contacted and termination resulted, unless a verified medical prescription was provided.  Artz Dep. Exhibit 8, ARTZ_004781, Artz Aug. 26, 2017, Email, attached as Exhibit I; Ex. A, Artz Dep. 146:1-5.

29.     Artz understood it was the employee's responsibility to provide the prescription of any drug indicated on a positive drug test.  Ex. A, Artz Dep. 141:6-9.

30.     On August 8, 2017, West Plains' plant employee L.G., a salaried employee, completed a random drug test.  AFI0003078-AFI0003082, L.G. Investigation Summary, attached as Exhibit J; Ex. B, L. Williams Dep. 281:2-7.[2]

31.     On August 16, 2017, L.G.'s positive drug test was posted on the Medical Review Officer ("MRO") website.  Ex. A, Artz Dep. 118:24-119:5.  Artz immediately asked L.G. to provide verifying documentation.  Ex. A, Artz Dep. 118:24-119:5.

32.     By August 18, 2017, L.G. had not provided verification for the medication causing the positive drug test.  Ex. A, Artz Dep. 119:6-10.

33.     Artz tried getting ahold of L.G.'s doctor.  Ex. A, Artz Dep. 119:20-21.  Artz completed a Google search of L.G.'s doctor, confirmed he had an active medical license, and went to the local hospital to try to track him down.  Ex. A, Artz Dep. 150:12-151:5.

34.     On August 22, 2017, Artz advised Ms. Williams of L.G.'s positive drug test.  Ex. A, Artz's Depo. 133:8-11.  Artz sent an email addressed to Ms. Williams, and copying Mr. Cooper,

[2]  All exhibits, including all relevant deposition excerpts, containing protected health information ("PHI") for any AFI employee other than Plaintiff are filed herewith under seal.

advising of the positive drug test and asking what action was recommended. AFI0007732, Artz Aug. 22, 2017, Email to L. Williams cc J. Cooper, attached as Exhibit K. On the same day, Artz and Ms. Williams also had an instant message conversation. AFI0000805-AFI0000807, Artz Aug. 22, 2017, Messages to L. Williams, attached as Exhibit L. Ms. Williams advised they needed to set up a meeting. *Id.* Artz stated he would include Mr. Cooper. *Id.* Artz also said he notified Mr. Cooper of the situation, including his efforts to help the employee anyway he could. *Id.* Artz noted Mr. Cooper and Mike Bell, AFI Vice President of Hardwood Manufacturing, and Mr. Cooper's immediate supervisor, were in VSA meetings. *Id.*; Ex. A, Artz Dep. 120:2-3.

35.     Mr. Cooper also was informed by Artz of the positive employee drug test on August 22, 2017. Ex. C, Cooper Dep. 160:16-161:6. Mr. Cooper was "pulled out of a meeting" with Mr. Bell and "made aware of the situation" by Artz. Ex. C, Cooper Dep. 160:16-161:6. Mr. Bell was at the West Plains plant on August 22, 2017, for VSA meetings. Ex. C, Cooper Dep. 165:9-13; *see also*, AFI0008294-AFI0008295, Hardwood VSA Reporting Conference Day 2 Appointment, attached as Exhibit M.

36.     Ms. Williams recalled Artz told her first and then Mr. Cooper, based on discussions she was having with Artz at the time. Ex. B, L. Williams Dep. 211:13-25. Specifically, she asked Artz if he had spoken to Mr. Cooper yet, and he told her no. Ex. B, L. Williams Dep. 212:18:23. Mr. Cooper informed Ms. Williams he did not know about the positive drug test prior to their conversations on August 22, 2017. Ex. B, L. Williams Dep. 219:16-220:6.

37.     The HR Matrix addresses discipline of a salaried employee, which would include suspension and potential termination for a positive drug test, and requires notification of the Senior HR Manager, amongst others. Ex. B, L. Williams Dep. 222:4-16; *see also*, Ex. E, HR Matrix – Edited May 2017.

38.     Once Ms. Williams finally learned of the positive drug test, she immediately instructed Artz to suspend L.G.  Ex. A, Artz Dep. 120:6-8.

39.     On August, 28, 2017, L.G. was terminated for a positive drug test, without a verifiable medical prescription.  Ex. A, Artz Dep. 120:14-16.

40.     In a prior employee positive drug test, involving employee J.N., on July 22, 2016, Artz contacted his supervisor the same day he learned of the situation.  Ex. A, Artz Dep. 154:3-155:25.  In responding to J.N.'s positive test, Artz terminated the employee that same day.  *Id.*

41.     Previously, Artz called employees' doctors to inform them that they needed to provide the prescription for an employee with a positive drug test; however, he never went to a hospital to try to contact an employee's doctor.  Ex. A, Artz Dep. 151:10-19.

42.     On August 25, 2017, Ms. Williams had a call with Artz in which she notified Artz of the need for immediate improvement in his performance.  Ex. A, Artz Dep. 192:6-9.

43.     Ms. Williams brought up numerous issues, including Artz needing to be more engaged, not having full trust of the plant management team, and lacking judgment in the handling of the L.G. investigation.  Ex. A, Artz Dep. 194:5-11; 195:9-12; 196:7-15; 196:16-23; 198:6-13.

44.     Specifically, Ms. Williams advised Artz effective immediately she needed to see a change in his behaviors and a change in the perception others have of him at the West Plains plant. AFI0000260-AFI0000263, L. Williams Note to EE File, attached as Exhibit N.  Ms. Williams conveyed her expectation other plant managers see Artz as a supportive partner.  *Id.*  Artz needed to hold regular meetings with the plant management in order to build trust.  Ms. Williams further stated, as a member of the West Plains plant management, Ms. Williams and Mr. Cooper needed to be able to count on him to do the right thing, raise concerns, and provide guidance and coaching when warranted.  *Id.*  Ms. Williams expressed this has been an area they have continued to ask

Artz to focus on since 2015, but had not seen evidence of improvement. *Id*.

45.     During this conversation they also discussed the L.G. positive drug test. *Id*. Ms. Williams advised Artz his lack of judgment in delaying notification of Mr. Cooper and herself by nearly a week was unacceptable. *Id*. Specifically, Mr. Cooper should have been notified first and then Artz should have followed the HR Matrix and contacted Ms. Williams to discuss next steps. *Id*. Ms. Williams conveyed it was not his place as HR Manager to track down subscription information for an employee. *Id*. Ms. Williams advised Artz's lack of judgment and lack of urgency in communicating with Mr. Cooper and herself had created concerns about his ability to properly investigate and follow-up on employee relations issues. *Id*.

46.     Ms. Williams then advised Artz perhaps he should begin to look for another job. *Id*. Artz responded he would like the opportunity to prove to her that he could do his job. *Id*.

47.     This call was considered a verbal warning of immediate performance improvement for which any additional infractions, or the failure to improve upon his professional competencies and behaviors, could result in disciplinary action up to and including termination. *Id.*

**F.     Artz's Dishonesty During Audit Investigation and Resulting Suspension.**

48.     In July and August of 2017, AFI's internal audit department conducted a plant-wide audit of West Plains regarding a number of issues, including purchase card ("p-card") transactions. Ex. A, Artz Dep. 156:31-157:13; Ex. C, Cooper Dep. 124:16-125:23.

49.     Artz had p-card transactions flagged for further review. Ex. A, Artz. Dep. 158:15-159:12.

50.     While questions regarding the originally flagged transactions were eventually resolved, internal audit brought forward additional questions regarding Artz, and other West Plains employees, to the attention of Jana Keck, AFI Manager, Compliance and Employment Practices.

Ex. B, L. Williams Dep. 161:2-16; 227:25-229:5.

51.    On August 10, 2017, Ms. Keck received the internal audit report from Courtney Etter, Manager, Accounts Payable.  AFI0002998, Karen Collins – Audit Timeline, attached as Exhibit O.

52.    On August 21, 2017, Ms. Keck began corresponding with Megan Chadwick, Assistant Manager, Accounts Payable, regarding the additional p-card audit questions.  *Id.*

53.    Ms. Keck brought additional questions regarding Artz and Karen Collins, Purchasing Manager, to Ms. Williams.  Ex. B, L. Williams Dep. 161:1-16; 165:14-166:2; 298:24-299:2.  Ms. Keck and Ms. Williams worked to address the additional concerns as to both individuals.  Ex. B, L. Williams Dep. 228:2-6.

54.    Ms. Collins ultimately was terminated as a result of her p-card infractions.  Ex. B, L. Williams Dep. 193:4-7.

55.    The questions raised at this time regarding Artz's p-card transactions included: excessive McDonald's purchases, use of the p-card versus travel and expense card for non-travel meals, excessive costs for solar eclipse sunglasses, and Amazon orders delivered to his home in his wife's name.  Ex. A, Artz Dep. 171:3-172:19; 175:19-25; 183:15-21.

56.    On August 29, 2017, Ms. Williams raised her concerns as to Artz's questionable p-card transactions with Mr. Cooper.  Ex. C, Cooper Dep. 128:15-20; 268:17-269:9; AFI0000259, J. Cooper Note to Artz's File, attached as Exhibit P.

57.    Ms. Williams and Mr. Cooper also discussed Artz's improper handling of the L.G. drug test, and Mr. Cooper's observation Artz's relationship with the rest of the plant management was not improving.  Ex. C, Cooper Dep. 260:16-261:1-3; 266:7-11.

58.    On August 30, 2017, Artz had a conference call with Mr. Cooper and Ms. Williams.

Ex. A, Artz Dep. 165:8-15; 167:15-22.

59. During the call, Ms. Williams questioned Artz about his excessive McDonald's purchase, use of the p-card versus travel and expense card for non-travel meals, excessive costs for eclipse sunglasses, and Amazon orders delivered to his home in his wife's name. Ex. A, Artz Dep. 171:3-172:19; 175:19-25; 183:15-21.

60. The AFI Purchasing Card Policy provides travel and entertainment expenses are not to go on the p-card, unless the travel and entertainment card use is not accessible or possible. AFI0006679-AFI0006685, AFI Purchasing Card Policy, attached as Exhibit Q.

61. Artz admitted he spent over $100 for six people at McDonalds on his p-card, and had items shipped to his home in his wife's name. Ex. A, Artz Dep. 179:3-187:21.

62. During the call, Artz told Ms. Williams he always used his p-card for meal purchases, such as the McDonalds' purchase in question. Ex. N, L. Williams Note to EE File.

63. Ms. Williams responded by stating this was not a true statement, as she had approved other similar purchases on Artz's travel and entertainment card. *Id.*

64. Separately, Ms. Williams questioned Artz regarding paying $600 for solar eclipse glasses. *Id.* Artz stated he spoke with Cooper about the purchase, to which Mr. Cooper stated he did not recall approving the purchases; however, if he had known the eclipse sunglasses cost, he would not have approved. Ex. C, Cooper Dep. 271:8-24; Ex. A, Artz Dep. 179:3-187:21.

65. Ms. Williams also raised Artz's improper ordering of supplies through Amazon himself rather than utilizing the company vendor and plant purchasing manager. Ex. N, L. Williams Note to EE File.

66. Ms. Williams questioned Artz as to why he had Amazon orders being sent to his home address under his wife's name. Ex. N, L. Williams Note to EE File. Artz responded he was

told that they did not have deliveries coming to the plant yet by Ms. Collins. *Id.* Ms. Williams asked Mr. Cooper if this was correct. *Id.* Mr. Cooper responded they did in fact have deliveries coming to the plant at this time. *Id.* Artz then stated he was told it was not safe to have deliveries come to the plant by Mr. Gregory. *Id.* Mr. Cooper confirmed he had no knowledge of items being unaccounted for or any instruction by him or his team to have items delivered to their homes. *Id.*

67. In Artz's deposition, he admitted he had the purchases shipped to his home under his wife's name by mistake because he did not change the name of the shipment and used their shared account. Ex. A, Artz Dep. 183:5-184:4.

68. Artz admitted his mistake to the audit team but provided a different reason to Ms. Williams during their conversation on August 25, 2017. *Id.*

69. Ms. Williams concluded Artz lied during this conference call. Ex. B, L. Williams Dep. 269:9-13.

70. At the end of the call, Ms. Williams informed Artz he was being suspended because of his handling of L.G.'s drug test and his dishonesty during the call regarding his questionable p-card transactions. Ex. A, Artz Dep. 165:10-15.

**G.    Artz's Termination by Lisa Williams for Lack of Trust and his Dishonesty.**

71. On or about August 31, 2017, Ms. Williams and Mr. Cooper discussed Artz, during which Ms. Williams said, based on the recent drug test and audit investigation issues, she was leaning towards making Artz's termination effective. Ex. C, Cooper Dep. 273:2-8.

72. On September 1, 2017, Ms. Williams terminated Artz's employment with AFI during a phone call. Ex. A, Artz Dep. 188:22-25. Mr. Cooper was on the call, as a witness, but did not speak. Ex. A, Artz Dep. 188:22-189:6; Ex. C, Cooper Dep. 278:6-17.

73. Ms. Williams' decision-making process was guided by the HR Matrix, the COBC,

and her own coaching as to conducting investigations and professionalism.  Ex. B, L. Williams Dep. 149:3-24.

74.     Ms. Williams' decision to terminate Artz was based on her determination she could not trust him anymore.  Ex. B, L. Williams Dep. 241:23-242:8.

75.     The specific facts Ms. Williams considered in her termination decision included:

a.      Artz's dishonesty during their conversation on the p-card audit investigation;

b.      Artz's poor handling of the L. G. drug test, specifically, poor judgment and inconsistencies with how he conducted the investigation, in comparison to other positive drug tests, including the delay in notifying Ms. Williams and Mr. Cooper, and Artz going to the hospital and speaking with hospital staff on the employee's behalf; and

c.      Performance deficiencies identified by Ms. Williams in Artz's performance reviews and feedback about lack of trust, respect, and rapport with his plant management.  Ex. B, L. Williams Dep. 209:21-211:12; 227:15-230:16; 237:16-238:5; 272:10-22; 342:1-14.

76.     Artz filed a Charge of Discrimination with the EEOC and MCHR on or about November 7, 2017.  ARTZ_02991, Artz Charge of Discrimination, attached as Exhibit R.

**H.      Artz's Violation of the COBC and HIPAA.**

77.     Artz signed an acknowledgement of the COBC on May 8, 2014.  AFI0000559, Artz COBC Acknowledgment, attached as Exhibit S.

78.     AFI granted Artz access to confidential information, in the course of his job duties as the West Plains HR Manager, regarding sensitive employee medical information, protected from disclosure by the COBC and the Health Insurance Portability and Accountability Act of 1996, P.L. No. 104-191, 110 Stat. 1938 (1996) ("HIPAA").  Declaration of Lindsey Groft, AFI Vice

President of HR, attached as Exhibit T; Ex. F, COBC; AFI0008117-AFI0008141, HR Policy – 20 HIPAA Privacy Policy & Procedures ("HIPAA Policy"), attached as Exhibit U; Ex. A, Artz Dep. 114:4-118:12; 150:12-154:2.

79.  Artz routinely accessed HIPAA-protected medical information pertaining to employees' drug test results and prescription medications, for the purposes of implementing AFI's drug testing policy.  Ex. A, Artz Dep. 114:4-118:12; 150:12-154:2; Ex. T, Declaration of Lindsey Groft.

80.  Artz was familiar with the COBC and in fact trained other AFI employees on the COBC requirements.  Ex. A, Artz Dep. 65:16-66:13.

81.  Artz was prohibited by the COBC and HIPAA from sharing any confidential medical information regarding other employees with anyone without a legitimate business reason for doing so.  HIPAA; Ex. U, HIPAA Policy, Ex. F, COBC; Ex. T, Declaration of Lindsey Groft.

82.  Artz understood HIPAA protections applied to information received related to employee drug tests.  Ex. A, Artz Dep. 150:12-24.

83.  On August 25, 2017, and August 26, 2017, shortly after Ms. Williams advised Artz he may want to start looking for a new job, Artz sent multiple emails to his personal e-mail account regarding the private medical conditions of four (4) AFI employees, with medical history spanning across his entire term of employment, because he was "scared, freaked out, upset" and "wasn't thinking rationally," as he was afraid he was going to be fired.  Ex. A, Artz Dep. 130:2-10; 152:13-153:3; *see also*, *e.g.*, Ex. I, Artz Aug. 26, 2017, Email; Artz Dep. Exhibit 10, ARTZ_004721, Artz Aug. 25, 2017, Email, attached as Exhibit V.

84.  Artz admitted sending personal medical information on other AFI employees to his personal e-mail account violated the COBC and HIPAA.  Ex. A, Artz Dep. 131:20-1; 151:7-13;

153:7-13.

85.     It was during Artz's deposition that AFI first became aware Artz sent personal medical information about other AFI employees to his personal e-mail account without a legitimate business purpose.  Ex. T, Declaration of Lindsey Groft; Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories, Interrogatory No. 12, attached as Exhibit W.

86.     Artz's violation of HIPAA and the COBC in a manner which compromised confidential HIPAA-protected medical information of numerous employees would have resulted in his termination.  *Id.*

87.     AFI has an established practice of disciplining employees for improper disclosure of confidential business or employee information, up to and including termination.  *Id.*

88.     On April 19, 2018, Michael Penney, VP Commercial National Accounts, received a Final Written Warning for undertaking actions, which put his safety and AFI assets, including his cellphone and laptop, at risk of being compromised.  AFI0008049, Disciplinary Action for M. Penney, attached as Exhibit X.  AFI advised Mr. Penney his conduct violated the COBC and in "most circumstances, violation of the COBC results in termination of employment."  *Id.*  Based on his "cooperation, acknowledgement and ownership of the situation" in lieu of termination, and "on a non-precedent setting basis" he was given the final written warning instead.  *Id.*

89.     On January 21, 2019, Matt Essex, Assistant Plant Controller, Kankakee, IL was terminated for his improper disclosure of confidential information in violation of the COBC.  AFI0008050-AFI0008054 and AFI0008108, Disciplinary Action for M. Essex, attached as Exhibit Y.  Specifically, Mr. Essex disclosed confidential AFI budgetary and product quality information to an individual, with whom he had a personal relationship.  *Id.*  After an investigation, which included Mr. Essex's acknowledgment of the improper disclosure, AFI made the decision to

terminate his employment.  *Id.*  Prior to termination, Mr. Essex had only received one written warning for a minor safety violation in 2011.  Ex. W, Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories, Interrogatory No. 9.

**I.      Artz Requested and Received FMLA Leave in 2017, as Did Other HR Managers.**

90.      The AFI Family Medical Leave (FMLA) Policy entitles eligible employees to take leave for qualifying reasons.  Ex. D, Employee Handbook.

91.      AFI contracts with a third-party provider, CIGNA Health ("CIGNA"), to coordinate the implementation of its FMLA leave policy.  Ex. A, Artz Dep. 45:4-11.  Employees directly contact CIGNA to put in a claim for FMLA leave.  Ex. B, L. Williams Dep. 198:20-199:2.  CIGNA approves or denies the leave requests and notifies the employee and AFI of CIGNA's decision.  Ex. A, Artz Dep. 47:4-21; 52:5-9.

92.      AFI is not responsible for deciding whether to grant an employee's FMLA leave request.  Ex. A, Artz Dep. 45:9-49.4.

93.      Artz did not use any FMLA in 2015.  Ex. A, Artz Dep. 233:12-21.

94.      Artz applied for FMLA in fall 2016 for leave from March 24, 2017, to May 12, 2017.  Ex. A, Artz Dep. 234:14-21; 235:10-14.

95.      On March 20, 2017, CIGNA provided correspondence to Artz approving his leave request.  Ex. A, Artz Dep. 236:9-237:1.

96.      Artz applied for FMLA in summer 2017 for leave in mid-September 2017, for a procedure pertaining to his wife's medical condition.  Ex. A, Artz Dep. 239:19-240:9.  Artz alleges he told Ms. Williams in June 2017 of his need to take this leave to take care of his wife.  Ex. A, Artz Dep. 237:2-13.

97.      Artz's FMLA leave for his wife's September 2017 procedure was approved by

CIGNA.  Ex. A, Artz Dep. 240:10-13.

98.     Following Artz's termination, he qualified for health care coverage through the Consolidated Omnibus Budget Reconciliation Act of 1985, P.L. No. 99–272, 100 Stat. 82 (1985) ("COBRA") from September 1, 2017, up through February 28, 2019.  AFI0001008-AFI0001019, Artz COBRA Notice, attached as Exhibit Z.

99.     All costs associated with Artz's wife's surgery in September 2017 were paid for by AFI through Artz's COBRA health insurance coverage.  Ex. A, Artz Dep. 281:22-282:3.

100.    Ms. Williams had no information regarding Artz's request for leave for his wife's upcoming surgery until after his termination.  Ex. B, L. Williams Dep. 197:23-198:15.

101.    Ms. Williams never spoke to Artz about his FMLA leave request for September of 2017.  Ex. B, L. Williams Dep. 199:3-7.  Further, Ms. Williams never spoke to Artz about anything to do with his wife.  Ex. B, L. Williams Dep. 198:11-15.

102.    Ms. Williams did not consider any FMLA use by Artz in connection with his termination.  Ex. B, L. Williams Dep. 337:20-23.

103.    Two other AFI HR employees took a week or more of FMLA leave between 2014 and 2017:  Kimberly Wake and Michael Bombard.  AFI0007102-AFI0007170, Leave Files for HR Managers, attached as Exhibit AA.

104.    Neither Ms. Wake nor Mr. Bombard received any discipline between 2014 and 2017.  Ex. T, Declaration of Lindsey Groft.

105.    Following Artz's termination, Ms. Wake assumed his duties and was then promoted to West Plains HR Manager.  Ex. T, Declaration of Lindsey Groft.

106.    In Mr. Bombard's 2017 Year-End Performance Review, he received a positive review noting he was exceeding his goals and having high competency.   AFI0007450-

AFI0007459, Bombard 2017 Year-End Performance Review, attached as Exhibit BB.

**J.     Lisa Williams, James Cooper, and Scott Gregory Had No Knowledge of Artz's Alleged Benefits Use or Medical Costs.**

107.    AFI has a self-funded benefit plan. Deposition of Scott Gregory ("Gregory Dep.") attached as Exhibit CC, at 32:21-24.   AFI's benefit plan is administered through a third-party vendor, Highmark, Inc. d/b/a Highmark Blue Shield ("Highmark").  Ex. CC, Gregory Dep. 146:7-11.

108.    In 2017, Highmark sent AFI aggregate employee medical costs on a weekly basis. Declaration of Robyn Yearsley, AFI Senior Benefits Manager, attached as Exhibit DD.

109.    Throughout 2017, the Global Business Systems, AFI's corporate accounting department, would make this information available to Plant Controllers through the general ledger on a monthly basis.  Ex. CC, Gregory Dep. 126:8-25.

110.    The aggregate medical costs were assigned to a specific cost center – individual plants.  Ex. DD, Declaration of Robyn Yearsley; Ex. CC, Gregory Dep. 20:4-14.  The West Plains plant has approximately 250 employees.  Ex. CC, Gregory Dep. 224:18-19.  The aggregate medical costs for each plant could be further sorted by hourly or salaried employees.  Ex. DD, Declaration of Robyn Yearsley; Ex. CC, Gregory Dep. 129:8-12.

111.    AFI does not receive from its third-party vendor Highmark, any individual employee's actual medical costs.   Ex. DD, Declaration of Robyn Yearsley; ARTZ_005180-ARTZ_005181, Highmark Subpoena Production, attached as Exhibit EE.

112.    Ms. Williams had no knowledge Artz or his family used medical insurance benefits, through the AFI benefit plan.  Declaration of Lisa Williams, former AFI Senior HR Manager, attached as Exhibit FF; *see also,* Ex. A, Artz Dep. 303:3-305:13; *see also,* Ex. B, L. Williams Dep. 194:3-195:9; 198:11-15; 354:10-14.

113.    Neither Ms. Williams, nor Mr. Cooper or Mr. Gregory, had any knowledge of any actual medical costs associated with Artz specifically.  Ex. B, L. Williams Dep. 354:10-25; Ex. C, Cooper Dep. 205:22-206:3; Ex. CC, Gregory Dep. 128:3-6; 202:16-20.

114.    Moreover, neither Ms. Williams, nor Mr. Cooper or Mr. Gregory, were informed of any individual employee's actual medical costs generally.  Ex. B, L. Williams Dep. 70:10-71:18; 86:12-22; Ex. C, Cooper Dep. 60:17-21; 62:25-63:2; 63:7-15; Ex. CC, Gregory Dep. 61:22-62:18.

115.    Artz never had a conversation with Ms. Williams regarding the medical costs of himself or any AFI employee.  Ex. A, Artz Dep. 287:21-289:6.

116.    Artz never had a conversation with Ms. Williams regarding his or his family's use of medical insurance benefits through the AFI benefit plan.  Ex. A, Artz Dep. 304:7-305:13; 307:17-308:9.

117.    There was no expectation for Mr. Cooper from senior leadership, with respect to medical costs, as they were simply a cost of doing business and come with some variances.  Ex. C, Cooper Dep. 60:17-61:3; 62:18-63:2; 65:3-66:2.

**K.     Artz has No Evidence of AFI's Supposed Knowledge of His Actual Medical Costs.**

118.    Artz alleges he was informed by another AFI employee, Mike Williams, West Plains Environmental Health and Safety ("EHS") Manager, that Mr. Williams overheard comments made by Mr. Cooper and Mr. Gregory regarding Artz's actual medical costs while Artz was out on leave in 2017.  Ex. A, Artz Dep. 231:4-7.

119.    Mr. Williams never heard anyone mention Artz in relation to his actual medical costs during or after any cost meetings in 2017.  Deposition of Mike Williams ("M. Williams Dep.") attached as Exhibit GG, at 35:15-24; 42:1-25.

120.    Mr. Williams never told Artz he overheard a reference to Artz's actual medical

costs during or after a cost meeting.  *Id.*

121.    Mr. Gregory never commented on Artz's actual medical costs, as these costs were unknown.  Ex. CC, Gregory Dep. 202:16-20; 203:18-204:4.

122.    Mr. Cooper never discussed the actual medical costs of any individual employee at West Plains in 2017, including Artz.  Ex. C, Cooper Dep. 205:10-16.

123.    Artz never had an AFI employee directly reference his actual medical costs.  Ex. A, Artz Dep. 249:13-18.  Artz never overheard any discussion between AFI employees referencing Artz's actual medical costs.  Ex. A, Artz Dep. 249:13-18.

124.    Artz never heard Mr. Cooper, Mr. Gregory, or Ms. Williams reference his actual medical costs to Artz.  Ex. A, Artz Dep. 250:20-25; 288:21-289:1.

125.    Artz did not discuss his actual medical costs with Mr. Cooper or Mr. Gregory.  Ex. A, Artz Dep. 264:8-15.

**L.      Artz's Alleged Comparators Demonstrates the Lack of Information Available Regarding AFI Employee's Actual Medical Costs.**

126.    Artz alleged he and two other West Plains plant employees, Ms. Collins and Mark Roberts, West Plains Yard/Kiln Manager, had high medical costs and were terminated because of those supposedly high medical costs.  Ex. A, Artz Dep. 218:9-19; 283:10-19; Complaint ¶¶ 54-55.

127.    Artz believed Ms. Collins and Mr. Roberts, through his wife, had high medical costs based on conversations about their procedures, surgeries, and time off work.  Ex. A, Artz Dep. 283:20-284:2.

128.    Artz has no personal knowledge of Ms. Collins and Mr. Roberts' actual medical costs.  *Id*.

129.    From 2014 to 2017, Ms. Collins had a total of $99 in medical bills associated with AFI.  Ex. EE, Highmark Subpoena Production.

130.     Artz was not aware that during that time, Ms. Collins only had a total of $99 in medical bills.  Ex. A, Artz Dep. 284:10-13.

131.     From 2014 to 2017, Mr. Roberts and his wife had approximately $4,800 in medical expenses, and his children had approximately an additional $1,000 in medical expenses.  Ex. EE, Highmark Subpoena Production.

132.     Artz also was not aware, Mr. Roberts and his wife only accounted for approximately $4,800 in medical bills associated with AFI from 2014 to 2017.  Ex. A, Artz Dep. 284:14-21; Ex. EE, Highmark Subpoena Production.

133.     Artz could not identify anyone else he believes was terminated because of their medical costs.  Ex. A, Artz Dep. 286:6-9.

**M.     AFI Had No Knowledge of Artz's Alleged Disability.**

134.     Artz alleges he was disabled.  Ex. A, Artz Dep. 225:15-25.  Artz testified he felt disabled with his diagnosis, inability to talk, heart biopsy, gastric surgery, and ICD implant.  *Id*.

135.     Artz retained Dr. Scott Roush, D.O., as an expert.  Dr. Scott Roush's Deposition ("Roush Dep."), attached as Exhibit HH, 36:2-12; 54:4-10.

136.     Dr. Roush treated Artz in 2016, and said Artz's major life activities at that time were "pretty limited."  Ex. HH, Roush Dep. 48:21-6; 49:7-19.

137.     Dr. Roush admitted he did not treat Plaintiff in 2017, and thus advised he could not provide any opinion as to Plaintiff's medical conditions in 2017.  Ex. HH, Roush Dep. 53:12-14; 54:15-55:4.

138.     Ms. Williams had no knowledge of Artz's alleged disability prior to his termination.  Ex. B, L. Williams Dep. 193:17-195:9; *see also,* Ex. FF, Declaration of Lisa Williams.

139.     Artz never told Ms. Williams he was disabled or what his alleged disability was.

Ex. A, Artz Dep. 192:16-193:9; 304:7-305:13; 307:17-308:9; Ex. B, L. Williams Dep. 194:13-195:9.

140.    AFI has no record of Artz being disabled.  Ex. T, Declaration of Lindsey Groft.

141.    AFI never considered Artz to be disabled.  Ex. T, Declaration of Lindsey Groft.

142.    While Artz went out on approved FMLA leave in 2017, at no point did Artz ever notify Lisa Williams he had a disability or any significant health condition which substantially limited one of his major life activities.  Ex. B, L. Williams Dep. 193:17-195:9.

143.    Artz never submitted a written disability accommodation request to AFI.  Ex. A, Artz Dep. 317:24-318:2.

144.    Artz never reported to AFI that he believed he was being discriminated against based on his alleged disability.  Ex. A, Artz Dep. 98:14-22.

145.    Artz alleges four (4) AFI West Plains plant employees discriminated against him because of his disability, but not Ms. Williams.  Ex. A, Artz Dep. 310:5-311:15.

146.    Artz accepted a position with Coca-Cola in Springfield, Missouri in January 2018. Ex. A, Artz Dep. 207:11-13.  On Artz's application, he indicated he was not disabled.  Ex. A, Artz Dep. 225:1-8.  Specifically, Artz did not check the available boxes for "Yes, I have a disability" or "I previously had a disability" but rather "No, I do not have a disability."  Ex. A, Artz Dep. 227:2-10; Artz Dep. Exhibit 11, OCCDP 000006-OCCDP 000007, Artz Coca-Cola Application, attached as Exhibit II.  Artz did not feel disabled at this time.  Ex. A, Artz Dep. 225:9-14.

## III.    ARGUMENT

### A.    Plaintiff's Claims.

Artz alleges claims of (I) discrimination and discharge in violation of the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 101, 1132, 1140 ("ERISA"), (II)

interference with rights protected by the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"), (III) retaliation and discharge for exercising rights protected by the FMLA, (IV) discrimination and wrongful discharge in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"), (V) discrimination and wrongful discharge in violation of the Missouri Human Rights Act, MO. REV. STAT. § 213.010, *et seq.* ("MHRA"), (VI) associational ADA discrimination, and (VII) associational MHRA discrimination, for his termination. Complaint, p. 10-20.

### B.     Applicable Summary Judgment Motion Standards.

### 1.     Summary Judgment Standards.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Defendants have the initial burden of showing that there is no genuine issue of material fact, which they can do simply by stating there is an absence of evidence to support an essential element of plaintiff's case.  *See Celotex,* 477 U.S. at 325.

Artz may not rest solely on the allegations in his pleadings, but must, by affidavit or other admissible evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)*; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 474, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Davidson & Assocs. v. Jung,* 422 F.3d

630, 638 (8th Cir. 2005). Likewise, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526–27 (8th Cir. 2007). In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

### 2. AFI Had Legitimate, Nondiscriminatory Business Reasons for Artz's Termination.

AFI terminated Artz for legitimate, nondiscriminatory business reasons. Artz fails to establish a *prima facie* case for all seven (7) counts of his Complaint, as discussed *infra.* However, *assuming arguendo* Artz can establish the necessary elements of each cause of action, his claims still fail as his alleged protected activities or categories were not the motivation for his termination. Artz's federal claims apply the *McDonnell Douglas* burden shifting analysis. *Koons v. Aventis Pharm., Inc.*, 367 F.3d 768 (8th Cir. 2004) (ERISA); *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008) (FMLA); and *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1164 (8th Cir. 1998) (ERISA, ADA, and MHRA). Under this analysis, if plaintiff has set forth a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–508 (1993). The employer's burden "is not onerous and the showing need not be made by a preponderance of the evidence." *Phillips,* 547 F. 3d at 912 (internal citations omitted) (affirming summary judgment for interference and retaliation claims brought under the FMLA where employer had legitimate nondiscriminatory reason for employee's termination – failure to

come into work prior to doctor's appointment with lack of balance of paid leave time to cover the absence).

A showing of pretext requires "substantial evidence" of pretext and discrimination, viewed in light of the employer's justification. *Phillips*, 547 F.3d at 912. To carry the pretext burden, Artz must show AFI's justifications are unworthy of credence. *Poitras v. Glaxo SmithKline Consumer Healthcare, LP,* 635 F. Supp. 2d 1003, 1013 (E.D. Mo. 2009). "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). Indeed, "it is not the court's 'province to decide whether [an employer's reasoning] was wise, fair, or even correct, ultimately, so long as it truly was the reason.'" *Rollins v. Mo. Dep't of Cons.*, 315 F. Supp. 2d 1011 (W.D. Mo. 2004); *see also Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308 (8th Cir. 1995). Under this analysis, Artz's termination was legitimate and non-discriminatory and thus worthy of summary judgment.

Artz was terminated by Ms. Williams due to a loss of trust in Artz and his inability to perform his job. SOF ¶¶ 74, 75. Ms. Williams was Artz's supervisor and the decision-maker for his termination. SOF ¶ 3. Specifically, Ms. Williams' decision was based on three reasons: 1) historical performance deficiencies identified in Artz's performance reviews and feedback from Artz's plant management, which reflected a lack of trust, respect, and rapport; 2) Artz's poor handling of an employee's positive drug test, specifically poor judgment and inconsistencies as compared to his handling of other positive drug tests; and 3) dishonesty toward Ms. Williams regarding questions pertaining to the p-card audit. SOF ¶ 75. Artz acknowledged Ms. Williams reviewed the plant management's concerns about his ability to support them, addressed the deficiencies in how he investigated the positive drug test, suspended him after the p-card

investigation, informed him she lost trust in him, and finally, terminated his employment. SOF ¶¶ 42, 43, 72.

**a. Historical Performance Issues Regarding Artz's Lack of Support for the Plant Management Was a Basis of Concern.**

Ms. Williams became Artz's supervisor in June 2017. SOF ¶ 3. Ms. Williams was made aware of prior concerns raised by the plant management with respect to Artz's performance reviews, which included issues with trust, respect, and rapport among his West Plains plant management. SOF ¶¶ 22, 75. Artz admitted he was advised in 2015 he needed improved performance in engaging with his plant management and being visible. SOF ¶ 21. Moreover, in his 2017 Mid-Year Evaluation, Ms. Williams notified Artz the concerns regarding the need to development trust with the plant management remained. SOF ¶ 22. Specifically, Ms. Williams told Artz his support for plant management was paramount and he needed more relationship building to better align with plant management. SOF ¶ 22. Ms. Williams also provided Artz with specific concerns he needed to improve in the areas of inviting feedback and demonstrating trustworthiness. SOF ¶ 22. Artz also was told he needed to utilize Ms. Williams and the HR Matrix to inform the appropriate people when issues arise. SOF ¶ 22. In August 2017, Ms. Williams received feedback from plant management indicating Artz's relationship with plant management had not improved. SOF ¶ 56. The recognized deficiencies in Artz's relationship with the other members of plant management was not the sole reason for Artz's termination, but merely the backdrop for Ms. Williams losing trust in Artz's ability to perform, and ultimately, his honesty. SOF ¶ 75.

**b. Artz's Mishandling of a Positive Drug Test and Resulting Verbal Warning.**

In August of 2017, Artz's poor handling of the investigation into an employee's positive

drug test resulted in Ms. Williams' loss of faith in Artz's ability to competently perform his job duties. SOF ¶ 39. As the HR manager for the West Plains plant and its over 250 employees, one of Artz's job duties was responding to positive drug tests for AFI's employees. SOF ¶¶ 25, 110. AFI had a policy of random drug testing for its employees for plant safety. SOF ¶¶ 23-24. As the plant Human Resources Manager, it was Artz's job to oversee the drug testing program and to investigate any positive drug tests. SOF ¶ 25.

Artz admitted he understood the significant safety issues posed by a positive drug test, particularly for any employees operating machinery. SOF ¶¶ 23-24, 27. Artz also knew a positive drug test would lead to termination, unless the employee could provide documentation verifying a medical prescription. SOF ¶ 28. Artz was aware he needed to follow the HR Matrix, which required him to immediately notify both Mr. Cooper and Ms. Williams of any situation involving potential discipline of a salaried employee. SOF ¶¶ 13-15, 37, 45. Moreover, Artz had previously immediately notified his supervisor with other positive drug tests. SOF ¶ 40. Specifically, when employee J.N. tested positive for drugs on July 22, 2016, Artz contacted his supervisor and suspended the employee on the same day he learned of the positive drug test. SOF ¶ 40.

Yet, Artz inexplicably failed to properly handle a positive drug test for employee L.G., a salaried employee at the plant. Artz learned of L.G.'s positive drug test on August 16, 2017; however, he admitted he did not inform Ms. Williams or Mr. Cooper until August 22, 2017, nearly a week after he learned of the positive drug test of L.G., a salaried employee. SOF ¶¶ 31-36. The August 22nd date is confirmed by Mr. Cooper, who could identify the date with certainty as his supervisor, Mike Bell, AFI Vice President of Hardwood Manufacturing, was visiting the plant on that date for a VSA meeting, and Mr. Cooper has a calendar entry for the VSA meeting. SOF ¶¶ 34-35. Moreover, Artz's own instant message conversation with Ms. Williams also demonstrates

28

she was not notified until August 22nd.  SOF ¶ 36.  When Ms. Williams finally learned of L.G.'s positive drug test, she directed Artz to immediately suspend L.G.  SOF ¶ 38.

Artz failed to comply with the applicable HR Matrix, and in the process, created a safety concern for the plant.  SOF ¶¶ 31-36, 45.  In addition to allowing an employee to work for a nearly a week following a positive drug test, Artz took the extreme action of going to a hospital to talk to staff and hunt down L.G.'s doctor.  SOF ¶¶ 33, 45.  Artz admitted he went to the hospital to try to locate the doctor.  SOF ¶ 33.  Artz admitted he previously had only called hospitals, and the ultimate responsibility for obtaining a doctor's prescription for any positive drug test rested with the employee, not Artz.  SOF ¶¶ 29, 41.

Ms. Williams found Artz's failure to properly notify her of the positive drug test, failure to immediately suspend the employee, and his overzealousness with his investigation on the employee's behalf to reflect profoundly poor judgment.  SOF ¶ 45.  During a phone call on the matter on August 25, 2017, Ms. Williams notified Artz of her loss of trust in him, the call would constitute a verbal warning, and Artz may want to start looking for another job.  SOF ¶¶ 42-47.

### c.    Artz's Dishonesty During Audit Investigation and Resulting Suspension.

At approximately the same time Ms. Williams was addressing Artz's failings with the positive drug test investigation, she learned from Ms. Keck of AFI Compliance of issues with Artz related to a plant-wide audit performed by AFI's corporate audit team.  SOF ¶ 53.  At the conclusion of Ms. Williams' investigation, she determined Artz had not been honest with her, which ultimately was the basis for her decision to terminate his employment.  SOF ¶¶ 59-69, 75.

Artz originally was flagged for questioning by the audit team for issues related to his p-card usage in July 2017.  SOF ¶ 48.  Artz admits there was an internal audit, which raised questions as to certain of his p-card purchases.  SOF ¶¶ 48-49.  In August, after these original matters were

resolved, Ms. Keck was notified of additional questionable transactions to be investigated. SOF ¶¶ 49-52. Ms. Keck notified Ms. Williams of these new issues. SOF ¶ 53. The timing of Ms. Williams' investigation of Artz's p-card purchases came from a natural progression and involvement of Compliance, following the corporate audit. SOF ¶¶ 48-53. Ms. Williams and Ms. Keck had questions as to Artz's excessive McDonald's purchase, his use of the p-card versus travel and expense card for non-travel meals, excessive costs for solar eclipse sunglasses, and Amazon orders delivered to his home in his wife's name. SOF ¶ 55.

On August 30, 2017, Ms. Williams interviewed Artz about his purchases. Mr. Cooper also participated in the call. During the interview, Artz admitted he spent $100 at McDonald's for six people, which Ms. Williams found excessive. SOF ¶¶ 59, 61. Artz admitted he put the McDonald's charge on his p-card, which is contrary to the p-card policy. SOF ¶¶ 60-61. Additionally, Artz told Ms. Williams he always used his p-card for meal purchases, which Ms. Williams said was false because she had approved prior meal purchases on his travel and expense card. SOF ¶¶ 62-63. Artz also asserted that a $600 purchase of solar eclipse sunglasses was approved, which Mr. Cooper had no recollection of approving, and noted he would not have approved had he known the cost. SOF ¶ 64. Additionally, Artz asserted he ordered items from Amazon to be shipped to his home under his wife's name because he was told by varying sources that deliveries were not coming in directly to the plant. SOF ¶ 66. Mr. Cooper denied that items were not being delivered to the plant then and confirmed he had no knowledge of any instruction not to have items delivered to the plant. SOF ¶ 66. Artz admitted in deposition, and apparently to the internal audit investigators, but not to Ms. Williams, his Amazon purchases were a mistake because he simply did not change the account he was using and used the account he shared with his wife. SOF ¶¶ 67-68. Finally, Artz also claimed the Amazon purchases were sent to his home

address, because he allegedly had been told it was not safe to have deliveries come to the plant. SOF ¶ 66. Mr. Cooper confirmed he had no knowledge of items being unaccounted for or any instruction by him or his team to have items delivered to their homes. *Id*. Ms. Williams ultimately determined Artz lied and was not being honest about these questionable transactions. SOF ¶ 69.

On September 1, 2017, having determined Artz had repeatedly lied to her during her investigation into his p-card usage, and after he only recently seriously mishandled the positive drug test, Ms. Williams determined she could no longer trust Artz and made the decision to terminate his employment. SOF ¶¶ 72-75. It should be noted the two events in question, occurring in July and August of 2017 were not initiated by Ms. Williams. Instead, Ms. Williams responded appropriately to Artz's own conduct, when it was brought to her attention. Thus, Artz will be unable to present any "substantial evidence" of pretext with respect to issues that were outside of Ms. Williams' control and to which she merely responded, once notified of the situations by others.

Finally, any potential argument from Artz of a fact dispute, as he may claim he did not lie to Ms. Williams and he acted appropriately in responding to the positive drug test creates neither a genuine issue of material fact nor establishes substantial evidence of a pretext, as Ms. Williams' understanding of the facts may be wrong; so long as the motivation for the termination was not discriminatory. *See e.g. Phillips,* 547 F.3d at 913 (assumption plaintiff was out of leave resulting in her termination being shown as an incorrect assumption did not create a genuine issue of fact that the reason for discharge was in fact the proffered reason because the facts still showed the decision-maker believed the plaintiff was out of leave which motivated the plaintiff's termination).

Artz understood as the highest ranking HR manager onsite at the West Plains plant, his ability to instill trust and confidence in his off-site supervisor was of paramount importance. SOF ¶¶ 33, 43-44. Artz violated that trust and undermined his credibility with Ms. Williams by lying

to her and failing to properly keep her informed of significant HR developments at the plant. These are legitimate reasons to terminate an HR manager, who should have known better. Moreover, even in a best case scenario for Artz – he could somehow prove he did not lie to Ms. Williams and properly handled the positive drug test – he still would not be insulated from summary judgment, as he cannot show Ms. Williams' decision was pretextual. Ultimately, AFI has established legitimate, nondiscriminatory reasons for Artz's termination, and as such, summary judgment should be granted as to all counts.

### 3. The After-Acquired Evidence Doctrine Applies as Artz's Improper Disclosure of Confidential, Medical Information Would Have Resulted in His Termination.

AFI is entitled to summary judgment on its after-acquired evidence affirmative defense as Artz's own admissions preclude any genuine issues of material fact and AFI is entitled to judgment as a matter of law and/or a cap on any potential damages. The after-acquired evidence doctrine allows a party to utilize evidence of a plaintiff's job misconduct, uncovered during discovery, to limit plaintiff's remedies, with respect to federal claims. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361-62 (1995) (applying the after-acquired evidence doctrine where plaintiff was afraid she was going to be fired and brought several confidential business documents home for "insurance" and "protection"). "Once an employer learns about wrongdoing that would lead to termination, this court does not 'require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.'" *Harris v. Dinesh Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007) (*quoting McKennon*, 513 U.S. at 362). The employer has the burden to establish the employee's "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone." *McKennon*, 513 U.S. at 362–63, 115 S. Ct. 879. In making

this determination, courts will review an employer's policies and actual employment practices. *Swyers v. Thermal Sci., Inc.*, 887 S.W.2d 655, 658 (Mo. Ct. App. 1994) (granting summary judgment where plaintiff falsified past work history and defendant provided an affidavit asserting it has a policy to verify past work history and would not have hired plaintiff had it known of the falsifications and provided documentation evidencing this practice with two other instances where it did not hire individuals based on such falsifications). In the federal context, the after-acquired evidence doctrine limits recovery, specifically advising that front pay in inappropriate and the beginning calculation of backpay should be solely from the date of the alleged unlawful discharge to the date the new information as to the terminable conduct was discovered. *McKennon,* 513 U.S. at 362.

Missouri courts have upheld the application of the after-acquired evidence doctrine as a complete bar to recovery for MHRA claims. *Swyers,* 887 S.W.2d 655 (Mo. Ct. App. 1994) (granting summary judgment on a MHRA claim); *see also, Carter v. CSL Plasma Inc.*, No. 13-CV-00814-FJG, 2014 WL 12825056, at *1-3 (W.D. Mo. Feb. 27, 2014) (ordering production of documents as to plaintiff's pre-employment disciplinary violations, reasons for employment ending, and information contained in employment applications to allow the development of an after-acquired evidence defense as to plaintiff's MHRA claim). As noted in *Swyers*, "[o]ne purpose of anti-discrimination legislation is to make persons whole for injuries caused by unlawful employment discrimination," by putting the plaintiff in the same position he would have been, but for the discrimination. *Id*. at 657-658 (citations omitted). Under Missouri law, where the plaintiff would have been fired anyway (due to his misconduct), he is not entitled to any relief. *Id*. at 657.

AFI would have terminated Artz for improper disclosure of confidential, HIPAA-protected medical information, had it known of his misconduct at the time it occurred. SOF ¶ 86. The

COBC and HIPAA policy prohibit the disclosure of confidential medical information without a legitimate business reason. SOF ¶ 81. Artz knew the terms of the COBC and the HIPAA policy and in fact trained other AFI employees on those rules. SOF ¶¶ 80-82. Nonetheless, Artz admitted he sent confidential medical information regarding other AFI employees to his personal email without a legitimate business reason. SOF ¶ 83. Artz admitted it was because he was "scared, freaked out, upset" and "wasn't thinking rationally." SOF ¶ 83. Artz further admitted his disclosure was in violation of the COBC and HIPAA. SOF ¶ 84. Artz did not comply with the COBC and broke the law. This admitted egregious misconduct is a terminable offense. It was only at Artz's deposition AFI learned for the first time of this terminable offense. SOF ¶ 85.

Further, AFI has a history of disciplining, up to and including termination, employees who improperly disclose confidential information. SOF ¶ 87. Artz's circumstance is most analogous to that of Mr. Essex, who disclosed confidential business information to a woman, with whom he had a personal relationship. SOF ¶ 89. At the time of the improper disclosure, Mr. Essex was not on any probationary period and had previously only been written up once several years prior for a minor safety issue. SOF ¶ 89. Nonetheless, once AFI learned of Mr. Essex's improper disclosure of confidential information, it terminated Mr. Essex for violation of the COBC. SOF ¶ 89. Artz's conduct was more egregious than Mr. Essex's conduct, as it was not merely business information that Artz improperly disclosed, but confidential, HIPAA-protected medical information. Artz's misconduct is exacerbated by the fact he knew what he was doing violated the COBC and HIPAA, because of his HR role, and the reason he did so was clearly in anticipation of this very litigation. SOF ¶¶ 80-84. Seeing the writing on the wall, Artz "freaked out" and emailed himself personal medical information on other employees, presumably because he thought it would help him prosecute this lawsuit. SOF ¶¶ 80-84. Artz's conduct was as inappropriate as it was inexcusable.

Further, Artz had just received a verbal warning following the L.G. drug test, and proceeded to send the improper emails over the next two (2) days.  SOF ¶ 83.  Based on Artz's admitted violation of the law and the COBC, his termination would have been warranted.  SOF ¶ 86.

Numerous other courts have upheld the application of the after-acquired evidence doctrine under similar circumstances.  *Miller v. Mercy Med. Ctr.-N. Iowa*, No. C05-2053 EJM, 2006 WL 3743830, at *1 (N.D. Iowa Dec. 18, 2006) ("reinstatement and front-pay are therefore precluded remedies, and any back-pay to which plaintiff might be found entitled would be limited to the period up to the discovery of the theft of the confidential patient records"); *Williams v. Asbury Auto. Grp., Inc.*, 998 F. Supp. 2d 769, 778 (E.D. Ark. 2014) (after-acquired evidence doctrine applied where plaintiff took confidential documents in violation of company policy); *Hill v. Wheatland Waters, Inc.*, 327 F. Supp. 2d 1294 (D. Kan. 2004) (after-acquired evidence doctrine applied where defendant "presented evidence that plaintiff copied and took employee records for her own use in violation of company policy" and plaintiff did not deny the conduct or that the conduct would have resulted in termination).

Thus, the application of the after-acquired evidence doctrine is proper.  AFI respectfully requests this Court grant summary judgment as to Plaintiff's MHRA claims (Counts VI and VII) as a result and find Plaintiff's remaining claims (Counts I-V) limited, if established at all, to back pay to November 29, 2018, the date of Plaintiff's deposition during which AFI discovered he improperly disclosed confidential medical information without a proper business purpose.

4.     **Artz Failed to Establish a *Prima Facie* ERISA Claim Because He Failed to Establish a <u>Specific Intent</u> by Ms. Williams to Interfere With His Benefits.**

Count I of Artz's Complaint fails as a matter of law, as he cannot establish the requisite elements of his ERISA cause of action or demonstrate AFI's legitimate non-discriminatory reason for termination was pretextual.

a.     **Artz Failed to Establish Any Direct Evidence Ms. Williams was Motivated by His Benefits Use or Had Any Knowledge of the Cost to AFI of Any Alleged Benefits Use.**

To establish a *prima facie* ERISA claim pursuant to Section 510 (29 U.S.C. § 1140) for interference with the employee's right to benefits, the employee must allege (1) the employer engaged in prohibited conduct, (2) with the **<u>specific intent</u>** to interfere, (3) with the employee's ERISA rights. *Register v. Honeywell Fed. Aff'g. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (emphasis added). "This specific intent is present where the employee's (future or present) entitlement to protected benefits is a motivating factor in the employer's decision. The Eighth Circuit has stated that in this context, "motivating factor" means a determining factor." *Haynes v. BIS Frucon Eng'g, Inc.*, No. 4:08-CV-701 CAS, 2009 WL 995460, at *8 (E.D. Mo. Apr. 14, 2009) *citing Koons v. Aventis Pharms., Inc.,* 367 F.3d 768, 777 (8th Cir. 2004).

As such, there must be a "causal connection between participation in a statutorily protected activity and an adverse employment action." *Kinkead v. Sw. Bell Tel. Co.,* 49 F.3d 454. 456 (8th Cir. 1995). Without evidence that an employee's termination was motivated by a desire to prevent him from obtaining benefits, a plaintiff cannot establish a *prima facie* claim of ERISA interference. *Haynes v. BIS Frucon Eng'g, Inc.*, No. 4:08-CV-701 CAS, 2009 WL 995460, at *7 (E.D. Mo. Apr. 14, 2009) (summary judgment granted where plaintiff alleged he was terminated to avoid allowing him to become fully vested in the employer benefit plan, but failed to provide evidence supporting

a link between his alleged potential entitlement to benefits and his termination). The loss of ERISA benefits as a consequence of termination is insufficient to show an employer's improper motive. *Regel v. K- Mart Corp.*, 190 F.3d 876, 881 (8th Cir. 1999). Instead, the employee must show the specific intent to interfere with those rights to allege a *prima facie* case of interference. Finally, ERISA interference claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 992 (8th Cir. 2009) (plaintiff could not establish employer's proffered reason for termination was a pretext merely because he believed he could have been deemed a special case allowing stock benefits to be continued, where no evidence his benefits were considered in the termination decision).

Artz's theory of the case is predicated upon the notion his allegedly high medical costs motivated AFI to terminate his employment, supposedly in order to save money. SOF ¶ 126. The undisputed material facts show this argument is utterly meritless. Specifically with respect to his ERISA claim, the alleged cost of his benefits usage is wholly irrelevant, as it is not a factor in the analysis.

Analysis of the elements actually at issue in his ERISA claim demonstrates Artz's inability to establish a *prima facie* case. Artz failed to present evidence demonstrating AFI had any intent to interfere with his usage of company benefits. Specifically, Ms. Williams, Artz's immediate supervisor and the decision-maker regarding his termination, had no knowledge of Artz's use of company benefits, much less his actual medical costs. SOF ¶¶ 112-116. Indeed, Artz conceded at deposition he had no evidence of Ms. Williams receiving information on his specific medical costs. SOF ¶¶ 115-116. Similarly, Artz could not offer any evidence Ms. Williams ever mentioned his specific medical costs. SOF ¶¶ 115-116. Further, AFI benefits were administered through the third-party vendor, Highmark. SOF ¶ 107. No AFI employee had access to actual medical costs

for any specifically-identified employee.  SOF ¶¶ 107-111.  Ultimately, there is no objective evidence tending to show Ms. Williams knew Artz had exercised any rights under AFI's benefits plan, a required element of the ERISA interference cause of action.

In response, Artz will no doubt assert Ms. Williams "knew" of his benefits use because he claims to have discussed with her his medical conditions, leave, and wife's upcoming hospitalization.  This argument fails as knowledge of medical conditions and upcoming medical leave is not synonymous with knowledge of an individual's use of the company's benefits program.  *See, Gaskins v. Rock-Tenn Corp.*, 982 F.Supp.2d 760 (S.D. Ohio 2013) (knowledge of daughter's lung condition and potential long term need for double-lung transplant was not sufficient to defeat summary judgment, where no evidence the decision-maker knew the specifics of the plaintiff's benefits plan or had considered or been made aware of the estimated future cost of the transplant).  Even if Ms. Williams arguably knew Artz was using some benefits – which she did not – Artz failed to establish Ms. Williams knew he was using **AFI's** employee benefits plan.

Artz's ERISA claim also fails for lack of any evidence that his use of company benefits was the motivating factor in his termination.  As set forth in detail above, AFI's termination decision was predicated on the legitimate grounds of his dishonesty with Ms. Williams and his poor handling of the positive drug test.  There is no evidence these reasons were pretextual and thus Artz also cannot prove Ms. Williams intended to terminate him to prevent his usage of AFI's employee benefits plan.

> **b.** **To Establish Knowledge of His Medical Costs, Artz Relies on an Alleged Conversation Between Two Managers of Which He Has No Personal Knowledge and Does Not Establish Knowledge By Ms. Williams.**

Artz has gone to great lengths in this case to raise the issue of his allegedly high medical costs as being the alleged basis for this termination. This argument is a tempest in a tea pot and of no moment in analyzing Artz's ERISA claims. Interestingly, Artz's primary focus is not on the actions or statements of Ms. Williams, his supervisor and the decision-maker regarding his termination. Instead, Artz claims a conversation between Mr. Cooper and Mr. Gregory shows AFI's supposed knowledge of his actual medical costs, which ostensibly then was the motivation for his termination. Artz's argument fails – factually and legally.

Artz claims Mike Williams, an EHS manager at West Plains, told him on two occasions in 2017 that Mr. Williams heard Mr. Cooper and Mr. Gregory discussing Artz's medical costs after a meeting with plant management. SOF ¶ 118. Artz's first problem on this issue is it lacks any evidentiary support. Mr. Williams, Mr. Cooper, and Mr. Gregory all deny the alleged conversations between Mr. Cooper and Mr. Gregory occurred. SOF ¶¶ 119, 121-122. Mr. Williams never heard Mr. Cooper or Mr. Gregory discuss Artz, or any other employee's actual medical costs at any time. SOF ¶ 119. Mr. Williams also denies ever telling Artz about conversations which never occurred in the first place. SOF ¶ 120. Further, Artz has no personal knowledge of this alleged conversation, or any discussion between any AFI employee referencing his actual medical costs. SOF ¶¶ 123-125. Thus, Artz's allegations regarding the supposed conversations, are nothing more than that – mere allegations, lacking any evidentiary basis.

Legally, Artz's self-serving claims about his alleged conversations with Mr. Williams do not create an issue of fact, as the allegations lack personal knowledge or other evidentiary support. Federal courts have routinely held when a proponent of an alleged fact lacks personal knowledge of said fact, this is not enough to properly support the alleged fact. *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). As an example, in *Manuele v. City of Jennings*, the court

disregarded plaintiff's "allegations of what [a manager] allegedly told Plaintiff" and granted summary judgment ruling "the Court will not consider those statements in ruling the motion for summary judgment."  No. 4:10CV1655 JAR, 2012 WL 113538, at *11-13 (E.D. Mo. Jan. 13, 2012) (statement by the manager that the plaintiff was being coerced to take a polygraph was inadmissible hearsay as they were asserted for the truth of the matter asserted and did not fit under present sense impression or state of mind exceptions); *see also, Grissom v. Arnott,* No. 09-03244-CV-S-SWH, 2012 WL 1309266, at *20 (W.D. Mo. Apr. 16, 2012) (granting summary judgment following defendant's argument self-serving facts alleging age was the reason for his termination, including unsupported statements lacking personal knowledge, are purely speculative, and lack foundation, and holding self-serving statements "cannot defeat a motion for summary judgment" and do not create a dispute of fact within itself) (*see also, Memhardt v. Nationstar Mortg., LLC,* No. 4:17-CV-01411-AGF, 2018 WL 5923445, at *4 (E.D. Mo. Nov. 13, 2018).  In *Grissom*, the court noted "the best way to handle such matters on summary judgment is to reduce the weight accorded to the affidavit."  2012 WL 1309266, at *20.  Thus, Artz's allegations regarding his ostensible conversation with Mr. Williams cannot create a fact dispute, due to his admitted lack of personal knowledge of the underlying conversation between Mr. Cooper and Mr. Gregory.

The final decisive flaw in this argument is neither Mr. Cooper nor Mr. Gregory made the decision to terminate Artz.  While Mr. Cooper participated in the audit investigation call with Artz and spoke with Ms. Williams regarding Artz prior to his termination, Mr. Cooper was not the decision-maker.  SOF ¶¶ 71-75.  Ms. Williams, and Ms. Williams alone, made the decision to terminate Artz.  *Id.*  This distinction is crucial, as Ms. Williams was not located in West Plains, did not attend any local leadership meetings in question and her undisputed testimony is she had no knowledge of Artz's actual medical costs.  SOF ¶¶ 3, 112-115.  As such, even if Artz could

establish Mr. Cooper and Mr. Gregory had conversations about his actual medical costs (which he cannot), Artz cannot show Ms. Williams had any knowledge of Artz's actual medical costs, much less that she terminated him based on knowledge she simply did not have. *See White v. Carmeuse Lime & Stone, Inc.*, No. 2:09-CV-265, 2011 WL 3585064, at *8-9 (W.D. Mich. May 31, 2011) (granting summary judgment to the employer on the plaintiff's ERISA interference claim, where the plaintiff alleged he was fired due to his managers' alleged knowledge of his daughter's illness, and finding there was not sufficient evidence to show his managers actually knew his medical costs).

c.   **In an Attempt to Establish Causation Between Alleged Knowledge of Medical Costs and Subsequent Termination, Artz Pointed to Two Comparators Who Only Demonstrate the Lack of Medical Cost Information Available and Lack of Causation.**

Artz asserts his ERISA claim is bolstered by AFI's termination of two other managers with supposedly high medical costs. SOF ¶¶ 126-127. Artz's conceded lack of knowledge about the actual medical costs associated with these individuals undermines the credibility of this specific argument and his general premise that his own termination was motivated by a desire to save money. SOF ¶ 128. Artz claims Karen Collins and Mark Roberts are comparators, as they allegedly were terminated around the same time and allegedly for the same reason - supposed high medical costs. SOF ¶¶ 126-127. Indeed, the undisputed facts show, neither Ms. Collins nor Mr. Roberts had anything remotely approaching "high medical costs." SOF ¶¶ 129-132. Documentation from AFI's third-party administrator, Highmark,[3] showed from 2014 to 2017, Ms. Collins had **$99** in medical costs and Mr. Roberts' and his family only had a total of approximately

---

[3] AFI did not have access to specific medical costs for Artz, Ms. Collins, Mr. Roberts, or any other AFI employee in 2017. This information was obtained from Highmark after a lawfully issued Court Order was served upon it. Ex. DD, Highmark Subpoena Production.

**$5,800**. SOF ¶¶ 129-132. Ms. Collins' number is not a typo, in four years, she had less than $100 in medical expenses. Artz admitted at deposition he had no actual knowledge of Mr. Roberts' or Ms. Collins' actual medical costs, the reasons for their terminations, or the identity of any other employee allegedly terminated due to their high medical costs. SOF ¶¶ 128-133. Artz's misunderstanding regarding the medical costs for these individuals demonstrates the weakness of his entire argument. Medical conditions do not equate to medical costs, which do not equate to use of AFI's employee benefit plan. Just as Artz was wrong about the medical costs for Mr. Roberts and Ms. Collins, so too was he wrong about the reasons for their termination, as well as the legitimate non-discriminatory reason for his own termination. As such, Artz cannot establish a *prima facie* case for an ERISA violation.

### d. Artz Failed to Establish Ms. Williams Terminated Him to Avoid His Benefits Payments.

In *Pendleton v. QuikTrip Corp.*, the Eighth Circuit noted, "[Plaintiff's] ability to prove a *prima facie* case of discrimination with regard to both the severance and stock plans rests on whether he can show that he was entitled to the benefits under either ERISA protected plan and that he was terminated by QuikTrip to avoid payment of these benefits." 567 F.3d 988, 992 (8th Cir. 2009). In determining the plaintiff failed to establish a *prima facie* case, the court reasoned, "[Plaintiff] offered no evidence to show that QuikTrip abruptly forced him out as a means to avoid giving him benefits." *Id.* at 994. So too here, Artz has failed to satisfy his burden to show Ms. Williams' decision to terminate his employment was some cost-saving maneuver, based on her alleged knowledge of his actual medical costs (which again is not relevant to the ERISA analysis) or his use of AFI's employment benefits plan. As Artz admitted at deposition, his wife's surgery in September of 2017, after his termination, was paid for by AFI through his COBRA insurance coverage. SOF ¶¶ 96-99. Artz's theory of the case thus falls apart when it is realized that AFI's

alleged improper motive for his termination – saving money on future medical expenses – was undermined by Artz's use of COBRA insurance coverage, which required AFI to pay for the very procedure Artz claims AFI wanted to avoid. Further, as an HR manager, Ms. Williams was not responsible for costs goals, but rather, was focused on people. SOF ¶ 7. Ms. Williams terminated Artz because of his poor performance. SOF ¶ 75. Artz has not and cannot show Ms. Williams terminated his employment to avoid payment of his AFI medical benefits. Therefore, Artz cannot establish a *prima facie* case of discrimination under ERISA, or show her legitimate reason for termination was a pretext for discrimination. As such, AFI is entitled to judgment as a matter of law on Count I of Artz's Complaint.

### 5. Artz Was Not Terminated for Taking or Requesting FMLA Leave.

Counts II (FMLA Interference) and III (FMLA Retaliation) are ripe for summary disposition as Artz took leave for his own medical condition in early 2017, without incident and his termination prior to his subsequent leave for his wife's medical condition was entirely unrelated to the leave request. "There are two types of claims under the FMLA: (I) 'interference' or '(a)(l)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA; and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008). "The difference between [interference and retaliation] claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Stalling v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006).

For his FMLA interference claim, Artz must allege: (1) he was an eligible employee; (2) defendant qualified as an employer as defined by the FMLA; (3) notice to defendant consisting of

at least verbal notice within several days of when the need for leave is known; (4) entitlement to FMLA rights; and (5) interference with the exercise of FMLA rights. *Phillips*, 547 F.3d at 911. In *Throneberry v. McGehee Desha County Hospital*, the Eighth Circuit held "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." 403 F.3d 972, 976 (8th Cir. 2005); *see also Ponder v. Verizon North, Inc.,* No. 4:09–CV–1763 CA, 2010 WL 4868080 (E.D. Mo. Nov. 23, 2010). The court in *Throneberry* explained, "[w]e initially note every discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights. However, the mere fact of discharge during FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights. … Thus, if the employer would have discharged the employee … if the employee were not on FMLA leave, then the employer would be justified in discharging the employee … while the employee was on FMLA leave." *Id*. at 980.

As a threshold matter, FMLA leave decisions for AFI's employees are not made by AFI. Instead, AFI contracts with a third-party provider, CIGNA, to administer its leave program. SOF ¶ 91. As such, it is CIGNA, not any AFI employee, who receives, processes, and decides whether to grant or deny FMLA leave requests for AFI's employees. SOF ¶¶ 91-92. AFI's lack of involvement in the decision-making process for FMLA leave requests undermines Artz's attempt to connect his leave to his legitimate termination.

Artz requested and was allowed to take leave for his own medical conditions, without issue in March, April, and May of 2017. SOF ¶ 94. Thus, there is no evidence AFI interfered with Artz's own FMLA leave. This understanding is critical in reviewing his additional FMLA claims. Artz alleges he told Ms. Williams in June 2017 about his need for leave for his wife's upcoming

procedure in September 2017.  SOF ¶ 96.  Artz's FMLA leave for his wife's procedure in September 2017 was approved through CIGNA.  SOF ¶ 97.  Artz was not on leave at the time of his termination.  Artz also does not allege his need for leave came up during any conversation regarding his suspension or termination.

Assuming *arguendo* Artz could establish a *prima facie* case for FMLA interference, he will be unable to rebut AFI's legitimate business reasons for his termination, which are wholly unrelated to Artz's requested FMLA leave.  Artz has not presented any credible evidence Ms. Williams would have made a different decision if he did not have leave pending.  The timing of his termination is based on the timing of the L.G. drug test and the questions raised by compliance related to the p-card audit.  There is no evidence of Ms. Williams looking for a reason to terminate Artz, because he applied for FMLA leave.  Rather, as discussed above, Ms. Williams responded to situations, which arose during the course of Artz's employment.  Upon investigation, Ms. Williams determined Artz was no longer trustworthy and unable to competently perform his job.  These reasons constitute a legitimate basis for termination, which is justified under *Throneberry*.  As such, AFI is entitled to summary judgment on Count II.

Count III also fails, as the undisputed evidence shows AFI did not retaliate against Artz for taking or requesting leave.  In order to establish an FMLA retaliation claim, Artz must prove:  (1) he exercised rights under the Act; (2) he suffered an adverse employment action; and (3) a causal connection between his exercise of rights and the adverse employment action.  *Phillips v. Mathews*, 547 F.3d at 912.  Artz's FMLA retaliation claim fails as he cannot establish a causal connection between his termination and taking FMLA leave.  *Malloy v. U.S. Postal Service*, 756 F.3d 1088 (8th Cir. 2014) (finding unpersuasive temporal proximity argument did not support a finding of causation, where employer provided evidence plaintiff was previously permitted to take leave

without adverse action); *see also, Kipp v. Missouri Highway and Transp. Com'n*, 280 F.3d 893, 896-897 (8th Cir. 2002) (evidence that gives rise to an inference of a "retaliatory motive on the part of an employer" is "necessary" to establish a causal link).

As a threshold matter, the significant gap in time between when Artz took his FMLA and when he was terminated militates against a finding of retaliation. Artz was on leave from March 24, 2017, to May 12, 2017; however, he was not terminated until September 1, 2017. SOF ¶¶ 75, 94. Over three months is too long to support a finding of causation without something more. *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (affirming judgment for employer, and finding two month gap between employers notice of need for leave and termination decision could not support causation element). Artz failed to establish any evidence showing Ms. Williams terminated him because he took FMLA leave, or explain why Ms. Williams supposedly waited over three months after his return to work to choose to retaliate against him. The reason for Artz's failure is clear – Ms. Williams did not terminate Artz because he took FMLA before she even became his supervisor.

Moreover, Artz cannot establish a causal connection as AFI has provided legitimate non-discriminatory reasons for his termination, which had nothing to do with his prior FMLA leave. To the extent Artz predicates his retaliation claim upon his request for leave in September of 2017, for his wife's medical condition, such a claim would fail for the same reasons articulated for Artz's leave. *Sisk*, 669 F.3d at 900-901 ("Generally, more than temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.") Moreover, in *Sisk*, the Eighth Circuit provided guidance as to how to measure temporal proximity, noting it should run from the date the employer knew of the planned use of FMLA leave. *Id.* Artz alleges he told Ms. Williams of his intended use of FMLA leave for his

wife's procedure back in June.  SOF ¶ 96.  Thus, over two months had passed since the alleged

notice, which is not enough to establish a causal connection, as recognized in *Sisk*.

Finally, for additional evidence showing AFI does not terminate employees who take

FMLA leave, the Court need look no further than Artz's replacement as HR Manager.  From 2014

through 2017, two other HR managers took a week or more of FMLA leave:  Ms. Wake and Mr.

Bombard.  SOF ¶ 103.  Neither of Artz's comparators suffered any adverse action as a result of

taking FMLA leave, and both continued to work for AFI as of the end of 2017.  SOF ¶ 104.  In

fact, Ms. Wake replaced Artz as HR Manager for the West Plains plant, after his termination.  SOF

¶ 105.  If AFI generally, or Ms. Williams specifically, truly discriminated against employees who

took FMLA leave, then certainly they would not have replaced Artz with another employee who

had exercised her own statutory rights.  These undisputed facts render Artz's FMLA retaliation

claims illogical and deficient as a matter of law.  As such, summary judgment should be granted

as to Count III.

> **6.** **Artz Cannot Establish an Alleged Disability or Show it Was Reason for His Termination.**

Counts IV (ADA) and V (MHRA) for alleged disability discrimination fail as a matter of

law, because the undisputed facts show Artz was not disabled, Ms. Williams had no knowledge of

his alleged disability, and it was not the reason for Artz's termination.  To make out a *prima facie*

case of disability discrimination under the ADA, Artz must show he:  "(1) is disabled within the

meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse

employment action because of her disability."  *Walz v. Ameriprise Fin., Inc.,* 779 F.3d 842, 845

(8th Cir. 2015).  Similarly, "[t]o establish a *prima facie* case under the MHRA the plaintiff must

show that:  (1) he [or she] is legally disabled; (2) he [or she] was discharged or suffered an adverse

employment action; and (3) the disability was a factor in his [or her] discharge or adverse

employment action." *Johnson v. City of Kansas City, Missouri*, No. 4:18-00015-CV-RK, 2019 WL 252539, at *2 (W.D. Mo. Jan. 17, 2019) (*citing Baldridge v. Kan. City Pub. Sch.*, 552 S.W.3d 699, 710 (Mo. App. 2018)). Claims under the ADA and the MHRA are governed by the same standards and both require Plaintiff to show that disability was in fact the motivating factor in his termination. *Krone v. City of Pine Lawn,* No. 4:16CV1801 RLW, 2017 WL 1424320, at *2 (E.D. Mo. Apr. 20, 2017); 42 U.S.C. § 2000e–2(m) (complaining party must establish protected class was "motivating factor" for any employment practice); MO. REV. STAT. § 213.101 (amended Aug. 28, 2017 (defining "because" or "because of" "as it relates to the adverse decision or action, the protected criterion was the motivating factor" and abrogating prior contributing factor standard).

Initially, Artz cannot show he was disabled at the time of his termination. In order to establish a disability, Artz must show he suffered a mental or physical impairment, which substantially limited a major life activity. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002); *see also, Ponder*, 2010 WL 4868080 at *8. Artz attempted to satisfy his burden to show he was disabled by retaining an expert, Dr. Roush. Dr. Roush treated Artz in 2016, and said Artz's major life activities at that time were "pretty limited." SOF ¶ 136. Critically however, Dr. Roush admitted he did not treat Plaintiff in 2017, and thus advised he could not provide any opinion as to Plaintiff's medical conditions in 2017, which is the time period in question. SOF ¶ 137. Thus, Artz's expert failed to provide any relevant evidence with respect to his condition at the time of his termination.

Moreover, Artz presented no evidence of how his medical conditions substantially limited his life activities in 2017. Heart conditions that impact an individual's cardiovascular system do not qualify per se as a disability. *Weber v. Strippit, Inc.*, 186 F.3d 907, 913-914 (8th Cir. 1999).

The court in *Weber* held that although the plaintiff had a heart condition, because he "failed to present sufficient evidence to establish that the nature, duration, and long-term impact of his medical problems caused him to be substantially limited in a major life activity" summary judgment was proper. *Id.* Here, Artz suffers the same infirmity and offers no evidence of any substantially limited life activities after he returned to work from his FMLA leave in May of 2017. FMLA leave is not synonymous with a disability and Artz cannot simply rely upon his FMLA leave to substantiate his alleged disability. *Boone v. Palomar Health*, No. 13CV1745 JLS (KSC), 2015 WL 11988943, at *8 (S.D. Cal. Nov. 3, 2015) (terminating an employee on the basis of his inability to do the job, even if based on his disability, is not the same as taking an adverse employment action against an employee in retaliation for the employee's use of leave); *Briggs v. Delta Air Lines, Inc.*, 353 F. Supp. 3d 641, 649 (E.D. Mich. 2019) ("General awareness of an employee's having taken medical leave is not the same as knowledge of that employee's specific medical condition.")

Furthermore, temporary, non-chronic impairments are usually not disabilities. *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997) (back injury where doctor provided work restriction recommendations contemplating plaintiff returning to regular work duties did not qualify as disability). The evidence shows Artz's medical conditions improved significantly over 2017, and Plaintiff has failed to present any evidence showing he was disabled upon his termination on September 1, 2017. In Artz's own testimony, he discussed the times he felt disabled, but focused on events occurring prior to his May 12, 2017, return, i.e., his diagnosis, inability to talk, heart biopsy, gastric surgery, and ICD implant. SOF ¶ 134. Notably, in January 2018, Artz submitted an application for subsequent employment, wherein he indicated he was **not** disabled. Artz testified he did not feel disabled at that time. SOF ¶ 146. Artz did not provide

49

evidence as to the extent of his alleged disability in the fall of 2017, or exactly when or how he stopped suffering from his alleged disability just a few months later.

Further, AFI did not perceive Artz to be disabled, as Ms. Williams had no knowledge of his alleged disability. SOF ¶¶ 138-144. To establish a perceived disability, a plaintiff must show the defendant "mistakenly believed that she had a physical impairment that substantially limited one or more major life activities" or mistakenly believed that she had an actual, nonlimiting impairment which substantially limited one or more major life activities." *Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001); *see also Alexander v. CSL Plasma,* Case No. 4:16-cv-131, 2016 U.S. Dist. LEXIS 89305, * 3 (E.D. Mo. July 11, 2016). Artz provided no evidence Ms. Williams perceived his condition as "substantially limiting" a major life activity. SOF ¶¶ 139, 142. At best, Artz only alleges he told Ms. Williams about his heart conditions. *Id.* Knowledge of a medical condition alone is not evidence of being regarded as disabled. *Nilles v. Givaudan Flavors Corp*., 521 F. App'x 364, 369 (6th Cir. 2013) (plaintiff failed to establish defendant knew plaintiff was disabled simply because he took two leaves of absences and they knew he was sick because "[k]nowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability."); *Brown v. BKW Drywall Supply, Inc.,* 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability.") Ms. Williams had no knowledge of Artz being allegedly disabled. *Id.* Ms. Williams did not manage Artz until June 2017, a month after he had returned from FMLA. SOF ¶¶ 3, 94. Artz never submitted any paperwork notifying AFI of any disability or requesting any accommodation for his alleged disability. SOF ¶ 143. Given Artz's role as the HR Manager for the plant, the lack of documentation of his alleged disability is telling.

Artz's disability claims also fail as he was not a qualified individual. To be considered a "qualified individual under the ADA," an employee must "(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Scruggs v. Pulaski Cty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016). A plaintiff must show that his "work performance met the employer's legitimate job expectations." *Wilking v. Cnty. of* Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (finding plaintiff was not qualified to perform the essential functions of her job where plaintiff had received multiple negative performance evaluations). Artz was terminated for a lack of trustworthiness and poor judgment, as set out above. Artz's conduct demonstrates he was not meeting AFI's legitimate job expectations and thus, was not qualified for his position at the time of his termination.

These same reasons also refute Artz's ability to establish a causal connection between his termination and his alleged disability. AFI had legitimate non-discriminatory reasons for Artz's termination, which act to undermine any alleged causal connection. More fundamentally, even if Artz was disabled (and he was not), Ms. Williams did not know of the alleged disability. It is axiomatic that Artz unsubstantiated disability claim could not have been the motivating factor in his termination, if Ms. Williams had no knowledge of it. *See, Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability" … "it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason."); *see also, Nilles*,

521 F. App'x at 369 (knowledge of symptoms does not necessarily equate to knowledge of disability).

Finally, at deposition Artz alleged claims of disability discrimination beyond his termination. Nonetheless, Artz's claims are limited in time and scope. Under the ADA and MHRA, a complainant is required to file a charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); V.A.M.S. 213.075. Artz filed his Charge of Discrimination on November 7, 2017. SOF ¶ 76. To the extent Artz attempts to present any allegations regarding alleged discriminatory conduct prior to May 11, 2017 (180 days prior to the Charge of Discrimination), including but not limited to conduct by the former plant manager or former HR manager, it should be disregarded as time barred. Further, Artz's Charge of Discrimination listed his termination only as the alleged adverse action. SOF ¶ 76. Thus, any allegations not related to Artz's termination are barred for failure to exhaust administrative remedies. *Richter v. Advance Auto Parts*, *Inc.*, 686 F.3d 847 (8th Cir. 2012) (a complainant under Title VII and the MHRA is required to file a charge within 180 days of the alleged unlawful employment practice and a charge must be filed as to **each** unlawful employment practice); *Nichols v. ABB DE, Inc.,* 324 F. Supp. 2d 1036 (E.D. Mo. 2004) (applying the same principle under the ADA).

Artz's claims for associational discrimination under the ADA and MHRA also fail. To establish a *prima facie* case of associational discrimination, Artz must establish: 1) he was qualified for his position; 2) he was subject to an adverse employment action; 3) he was known to be associated with a disabled individual; and 4) his discharge occurred under circumstances raising a reasonable inference that his association with a disabled individual was a determining factor in the decision to fire him. *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir.1997).

As with Artz's claims as to his own disability discrimination, Artz has failed to allege facts to show Ms. Williams, or anyone at AFI, knew his wife was disabled. Artz testified he told Ms. Williams in June of his wife's medical condition. SOF ¶ 96. However, Artz provided no evidence as to any major life activities which were substantially limited for his wife, any perception by Ms. Williams of Mrs. Artz's alleged disability substantially limiting her life activities, any evidence this was not a temporary condition, or any perception by Ms. Williams she had anything more than a temporary condition that could be treated with this surgery. Artz failed to establish he was associated with a disabled person because he failed to establish his wife was disabled. *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997); *Weber v. Strippit, Inc.*, 186 F.3d 907, 913-914 (8th Cir. 1999). Moreover, as discussed above, any information Ms. Williams received in June related to Artz's leave or his wife's medical conditions are not close enough in time to raise an inference of discrimination. Finally, AFI had legitimate non-discriminatory reasons for Artz's termination, which act to undermine any alleged causal connection between his termination and his wife's alleged, but unsubstantiated disability.

Plaintiff's disability and associational disability discrimination claims brought under the ADA and MHRA (Counts IV-VII) fail because Plaintiff cannot establish the *prima facie* claims.

## IV.  CONCLUSION

AFI terminated Artz because of his dishonesty and his inability to perform his job. Nothing in the record creates even the slightest inference of discrimination on the part of AFI. Additionally, as a matter of law, Artz's recovery should be barred, in whole, or in part, by the doctrine of after-acquired evidence, as Artz violated company policy and federal law in the course of his employment when he forwarded confidential HIPAA-protected medical information to his personal e-mail account without a legitimate business reason. This conduct would have warranted

Artz's termination, had he still been employed by AFI when discovered. As such, AFI is entitled to summary judgment on all of Plaintiff's Counts and its affirmative defense of after-acquired evidence.

Respectfully submitted,

*/s/ Joseph M. Wientge, Jr.*

Joseph M. Wientge, Jr. #57494
jwientge@littler.com
Lillian T. Manning #68432
lmanning@littler.com
LITTLER MENDELSON, P.C.
600 Washington Avenue, Suite 900
St. Louis, MO 63101
Telephone: 314.659.2000
Facsimile: 314.659.2099

Attorneys for Defendant Armstrong Flooring, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system to be served by operation of the Court's electronic filing system upon the following:

Kevin J. Dolley #54132
kevin@dolleylaw.com
James Keaney #67173
james.keaney@dolleylaw.com
LAW OFFICES OF KEVIN J. DOLLEY, LLC
2726 S. Brentwood Blvd.
St. Louis, MO 63144

*/s/ Joseph M. Wientge, Jr.*

FIRMWIDE:164460474.1 092785.1005